# CHARLESTON.

BLUE JACKET CONSOLIDATED COPPER CO. *v.* SCHERR, *Auditor.*

Submitted November 30, 1901. Decided December 18, 1901.

1. ILLEGAL TAX—*Collection of.*
   The collection of an illegal tax cannot be enjoined upon the sole ground that it is illegal. (p. 538).

2. INJUNCTION—*Tender of Taxes Due.*
   A bill for an injunction to stay the collection of taxes must tender or offer to pay such taxes as are conceded to be due, or as the court can see ought to be paid, as a condition precedent to the granting of such relief. (p. 540).

3. STATE OFFICERS—*Personal Trespass—Nominal Party to Suit.*
   State officers who, under the color of the authority of unconstitutional state legislation, are guilty of personal trespasses and wrongs, may be sued, although the Constitution of this State provides that the State shall never be made defendant in any suit at law or in equity; and suits may be maintained against such officers in their official capacity, to arrest or direct their official action, by injunction or *mandamus,* when said suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest; but in other cases such suit cannot be maintained when such officer is only a nominal party, for such suit is then tantamount to a suit against the State. (p. 542, 543).

4. CORPORATIONS—*Licenses—Constitutional Law.*

   Sections 86 and 87 of chapter 35 of the Acts of the legisla-
   ture of 1901, classifying corporations chartered under the laws
   of this State, and designating those having their principal
   places of business or chief works outside of the State as non-
   resident corporations, and imposing upon them a greater license
   tax than upon those having their principal places of business
   and chief works within the State, does not, in so classifying
   them and discriminating, violate section 1 of Article X of the
   Constitution of this State, nor clause 1 of section 10 of Article I
   of the Constitution of the United States, nor the Fourteenth
   Amendment to the Constitution of the United States, and is,
   therefore, valid and the charge of such greater tax upon such
   non-resident corporation legal.

Appeal from Circuit Court, Kanawha County.

Bill by the Blue Jacket Consolidated Copper Company against
Arnold C. Scherr, auditor of the State of West Virginia. From
a judgment sustaining a demurrer, plaintiff appeals.

*Affirmed.*

GEO. A. McGLONE, N. J. WATERBURY, CLEON MOORE and
HENRY WESTON, for appellant.

BROWN, JACKSON & KNIGHT, for appellee.

POFFENBARGER, JUDGE:

This is an appeal from a decree of the circuit court of Kana-
wha County, sustaining a demurrer to a bill in equity, filed by the
Blue Jacket Consolidated Copper Co., a corporation organized
and existing under the laws of this State, against Arnold C.
Scherr, Auditor of the State of West Virginia, praying that the
said Scherr, as Auditor of the State of West Virginia, may be
restrained from proceeding, or attempting to proceed, to collect
the franchise or license tax, imposed upon said corporation by
section 87 of chapter 35, Acts of 1901, amending certain sec-
tions of chapters 52, 53, 54, 32 and 66 of the Code, and from
proceeding to institute or procure the institution of any action
or actions for the forfeiture of the charter of said company pur-
suant to the laws of this State. The payment of said tax is re-
sisted on the ground that the act violates the provisions of sec-
tion 1 of Article X of the Constitution of this State and the pro-
visions of the Constitution of the United States, prohibiting any

state from passing any law impairing the obligation of contracts.

Section 1 of Article X of the Constitution of this State reads as follows: "Taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in. proportion to its value, to be ascertained as directed by law. No one species of property from which a tax may be collected, shall be taxed higher than any other species of property of equal value; but property used for educational, literary, scientific, religious and charitable purposes; all cemeteries and public property may, by law, be exempted from taxation. The legislature shall have power to tax, by uniform and equal laws, all privileges and franchises of persons and corporations." It is claimed that said act violates the last clause of said section.

The legislature, by section 8 of chapter 20 of the Acts of 1885, classified corporations, chartered under the laws of this State, for the purpose of taxation, imposing upon those which had their principal places of business or chief works outside of the State a much heavier license tax than those having their principal places of business or chief works located inside of the State. That provision of the act is as follows: "Upon every corporation which has heretofore obtained or which shall hereafter obtain a charter or certificate of incorporation from this State, and whose principal place of business or chief works are located inside of this State, there shall be an annual license tax of ten dollars, to be paid on or before the first day of May of each year, or at the time of obtaining such charter or certificate of incorporation, and on or before the first day of May thereafter, as the case may be, to the auditor, and by him turned into the general treasury.

And upon every corporation which has heretofore obtained or which shall hereafter obtain a charter or certificate of incorporation from this State, and whose principal place of business or chief works are located outside of this State, there shall be an annual license tax of fifty dollars, to be paid on or before the first day of May of each year, or at the time of obtaining such charter or certificate of incorporation, and on or before the first day of May thereafter, as the case may be, to the auditor, and by him turned over to the general treasury of the State."

Chapter 35 of the Acts, 1901, preserves the same classification and greatly increases the license tax upon both classes of cor-

poration. For convenience and by way of classification, it provides that those corporations whose principal places of business or chief works are located within this State shall be known as resident corporations for the purposes of said chapter, and that those whose principal places of business or chief works are located outside of this State should be known as non-resident corporations for the purposes of said chapter.

As has been seen, the annual license tax on every corporation, having its principal place of business or chief works located outside of the State was fifty dollars under the Act of 1885, without regard to the amount of its capital, while the tax on every corporation having its principal place of business or chief works located within the State was only ten dollars. By chapter 35 of the Acts of 1901, the annual license tax on both classes of corporations, chartered under the laws of this State, is graduated according to their authorized capital stock, on non-resident corporations beginning with twenty dollars and going up to one thousand and ten dollars and an additional fifty dollars on each and every one million dollars or fraction thereof, in excess of four million dollars, when the authorized capital stock is more than four million dollars. The company complaining here has an authorized capital stock of one million dollars, which, under this act, makes its annual license tax four hundred and ten dollars instead of fifty dollars. The tax on resident corporations is a great deal less. Its certificate of incorporation is dated January 25, 1901, and said chapter 35 went into effect February 18, 1901.

The principal administrative provisions of the license tax law are, that the tax year shall begin on the first day of May and end on the 30th day of April next ensuing; that the tax shall be payable at the beginning of such year; that the auditor, on or before the first day of March in each year, shall notify every corporation, liable to such tax, of the amount thereof and the time of payment; that the auditor, within sixty days after the first day of May of every year, shall publish, in some newspaper of general circulation published at the capital of the State, a list of all such corporations as have failed to pay the license tax which became due on the first day of May preceding; that any such corporation may, within sixty days after such publication, or before the first day of September of that year, pay to the auditor such tax and five dollars in addition and an additional one per

cent for each month of such failure, and thereby be relieved from the forfeiture of its charter; that failure to make such payment within such time shall work a forfeiture of the charter; that the auditor shall furnish the governor and secretary of State, within thirty days after the first day of September of each year, a list of all corporations which have so forfeited their charters; that the governor shall publish a proclamation containing a list of all such corporations, proclaiming such forfeiture, and thereafter the charter of such corporation shall be absolutely void and of no effect; that after the publishing of such proclamation, the attorney general shall institute a suit or proceeding, in the name of the State of West Virginia, against such corporation, to have its charter judicially declared forfeited, and the failure of such corporation to pay any such license or penalty due the State shall be deemed, in such suit or proceeding, a misuse of its corporate privilege and franchises, and it shall be deemed as acting without authority of law, after such failure; and that, if after any such suit or proceeding shall be instituted, such corporation shall appear therein and pay the tax and penalty then due and the costs of such suit or proceeding, the same shall be dismissed and the corporation relieved from the effects of such forfeiture for failure to pay such tax or penalty.

Appellant's bill shows that it has failed to pay the license tax assessed against it for the year beginning May 1, 1901, and ending May 1, 1902; that the auditor has notified it of the amount and time of payment of said tax; that it has notified the auditor that it declines to pay said tax because the act imposing it is unconstitutional and void; and that the auditor has notified it that it will be included in the list of delinquent corporations which he is required to publish in a newspaper and that it will be certified to the governor and secretary of State for the action of the attorney general, looking to the absolute forfeiture of its charter.

It is contended by counsel for the appellee that the decree of the circuit court, sustaining the demurrer and dismissing the bill is right; *first,* because the bill shows no ground for relief; *second,* because the circuit court had no jurisdiction of the bill; and *third,* because the act of the legislature in question is clearly constitutional. There is no reason why this Court may not pass upon all these grounds in determining whether it will affirm or reverse the decree. If the court below had granted the relief

prayed for, and the bill had been prematurely filed or for other reason not entering into the real merits of the controversy, its decree should be reversed, although upon a proper bill it might be entitled to such relief, this Court might be restricted to an examination of such preliminary questions only. But here the court gives no relief and any one of the grounds assigned may be sufficient to warrant an affirmance of the decree and this Court may, if it find that the decree is right, base its affirmance upon any of them. In other words, all these questions fairly arise upon the record as the case stands here. The bill sets out the whole case without replication, answer or depositions. Section 5 of Article VIII of the Constitution provides that: "When a judgment or decree is reversed or affirmed by the Supreme Court of Appeals, every point fairly arising upon the record of the case shall be considered and decided." As the main question, whether the act of the legislature involved is constitutional, is one in which the public, as well as the parties here, has great interest, calling for a speedy settlement of it, to the end that the public business may not be delayed and the collection of the revenues of the State impeded, and both parties desire a determination of that question by this Court, it claims greater and more careful consideration than any of the other questions raised. However, all will be considered.

Appellant relies upon *Douglas* v. *Harrisville,* 9 W. Va. 162; *Corrothers* v. *Board of Education,* 16 W. Va. 527; *Railroad Co.* v. *Miller, Auditor,* 19 W. Va. 408, holding that a court of equity will enjoin the collection of an illegal tax when the case made by the bill presents special circumstances, bringing the case under some recognized head of equity jurisdiction, such as that the enforcement of the tax would lead to a multiplicity of suits, produce irreparable injury, or cast a cloud upon the title of the complainant to real estate, but that it will not do so upon the sole ground that the tax is illegal. The appellant does not sue on behalf of itself and other taxpayers. There is no allegation in the bill that anybody is likely to be affected by the collection of this alleged illegal tax except the plaintiff therein. It is perfectly clear that nobody but the State can proceed against it for such collection. In other words, no county, school district or municipal corporation in the State is entitled to, or can claim, any part of said tax. So the appellant cannot be subjected to but one proceeding, one suit, for its collection. In this respect

the case is entirely different from that of the *C. & O. Ry. Co.*
v. *Miller, Auditor.*   There, not only the State, but every county,
district and municipal corporation, through which the line of
the company's railroad ran, was entitled to its taxes.   Under the
law the auditor might collect the whole tax by voluntary pay-
ment by the company into the treasury.   But, if such payment
were not made, then the sheriffs of the various counties might not
only proceed to collect, but actually to distrain the property of
the railroad company in so doing.   Here no power of distraint
against the appellant is vested in any officer.   Payment can
never be finally enforced except by the judicial proceeding to be
instituted by the attorney general of the State.   In that pro-
ceeding the delinquent corporation has the right to come in and
pay the tax and penalty and costs of the suit and thus be entitled
to relief from the forfeiture of its charter.   It is perfectly clear
that this company may make all its defenses in that suit, includ-
ing that of the unconstitutionality of the law imposing the tax.
It is also manifest that that adjudication would be final, forever
settling between the State and the company the validity or in-
validity of the law imposing the tax.   In *Douglas* v. *Harrisville,*
cited, the bill is filed in the name of the plaintiffs alone, alleging
the illegality of the tax and that their personal property had
been distrained, and the court dismissed the bill as presenting no
cause for equitable interposition.   In *Corrothers* v. *Board of Edu-
cation,* cited, the bill was filed by the plaintiffs on behalf of them-
selves and the other taxpayers of the district.   The court held the
bill good on demurrer, but dismissed it on final hearing because
the tax was not illegal.   In *Railroad Company* v. *Miller,* the bill
was held good on demurrer and the reasoning of the court in
that connection is stated by JOHNSON, PRESIDENT, as follows:
"In this case the auditor under the statutes was proceeding in
the exercise of a purely ministerial duty; there was nothing
whatever left to his discretion.   The law required him, after the
assessment against the railroad corporation had been made, to
notify it through its officers of the amount to be paid, and if it
was not paid in time specified in the law, to add ten per cent. to
the amount and certify the taxes down to the proper officers for
collection in the counties, through which the road passed.   To
prevent a multiplicity of suits, the company had the right to test
its liability to pay the taxes in one suit restraining the auditor
from the performance of the ministerial duty, without perform-

ance of which the sheriffs in counties of course could not proceed. It is much more convenient both for the company and for the officers charged with the collection of the taxes, that it should be done in this way, and is much less injurious to the interests of the State, than it would be to have a number of suits instituted for the purpose of arresting the collection of taxes in the several counties. I think the court clearly had jurisdiction of the cause."

In view of these principles it cannot be said that the bill states a case for equitable relief, if it were conceded that the tax is illegal. It does not show the probability of a multiplicity of suits in any way affecting it or its property. Nor is it pretended that the collection of the tax, conceding it to be illegal, would result in irreparable injury to it. Nor does it appear that it has a foot of real estate in the State of West Virginia upon the title to which this tax might be a cloud. Nor does it set forth facts which bring it within any of the recognized principles of equity jurisdiction.

Another objection to the bill is that it does not tender nor offer to pay such tax upon its franchise as the court can see that it ought to pay. It claims to be, and undoubtedly is, a resident corporation. It is chartered under the laws of this State. It is a citizen of this State, although its principal office, place of business and chief works are in the state of New York. Its designation in the statute as a non-resident corporation, is only a name given it to distinguish it from other resident corporations which maintain their principal places of business and chief works within the State, for the sole purpose of determining whether it shall pay a higher or a lower rate of taxation prescribed by the statute. Being a resident corporation it is undoubtedly liable to pay some tax. It is not contended in the argument that it would not be liable to pay the lower tax imposed upon the other class of resident•corporations. The steps to be taken by the auditor, hereinbefore detailed, and which the appellant seeks to enjoin, affect both classes of corporations and are intended to forfeit their charters. To unqualifiedly prevent the auditor from taking these steps, preliminary to the forfeiture of its charter for the non-payment of taxes and penalties, would relieve it from the payment of any taxes. So, it seems that, aside from the well known and well settled principle that a party asking equity must do equity, the appellant here was bound to

tender or offer to pay such tax as it ought to pay, as a condition precedent to any equitable relief in the premises.   In this respect the case is very similar to that of a person attacking a tax deed without tendering or offering to pay what the law says he shall pay.   In *McClain* v. *Batson,* decided at this term, this principle was discussed and it was held that a bill which failed in that respect was bad on demurrer although the party was entitled to relief upon a proper bill.   The proposition, that a plaintiff seeking to enjoin the collection of an illegal tax can have no relief, until it is shown that all taxes, conceded to be due, or which the court can see ought to be paid, have been paid or tendered, is affirmed in *State Railroad Tax Cases,* 92 U. S. 575.

It is also claimed that section 35 of Article VI of the Constitution of this State providing that:   "The State of West Virginia shall never be made defendant in any court of law or equity," effectually precludes the entertainment of this bill, for the reason that a suit against the auditor in reference to this tax is a suit against the State.   If the appellant were entitled to any relief upon the case made in its bill, this position could hardly be considered tenable in the light of the decision of the Court in *Railroad Co.* v. *Miller,* holding that "although the state cannot be sued, yet an injunction will lie against the auditor of the State to restrain him from the performance of a mere ministerial duty."   It cannot seriously be contended that the duties required of the auditor, looking to the forfeiture of the charter of the appellant company, are anything more than mere ministerial acts, preliminary, although necessary, to the institution of a judicial proceeding for the final and absolute forfeiture of the charter.   Although it is said that, after the proclamation of the governor, the charter of such corporation shall be absolutely void and of no effect, the statute further provides for relief from such forfeiture and the matter is not final between the State and the company until the forfeiture is judicially declared and the power to redeem finally cut off.   But the effect of the acts done by the auditor cannot determine the character of the act. The statute vests no discretion whatever in him, judicial or otherwise.   It simply minutely prescribes his duties and requires him to perform them, itself pronouncing the force and effect of these acts.   However, since the decison in the case of *Railroad Co.* v. *Miller,* the Supreme Court of the United States, *In re Ayers,* 123 U. S. 443, has given the subject exhaustive consideration and

holds that, "If a bill in equity be brought against the officers and agents of a state, the nominal defendants having no personal interest in the subject-matter of the suit, and defending only as representing the State, and the relief prayed for is a decree that the defendants may be ordered to do and perform certain acts which, when done, will constitute a performance of an alleged contract of the State, it is a suit against the State for the specific performance of the contract within the terms of the 11th Amendment to the Constitution, although the state may not be named as a defendant; and, conversely, a bill for an injunction against such officers and agents, to restrain and enjoin them from acts which it is alleged they threaten to do, in pursuance of a statute of the state, in its name, and for its use, and which if done would constitute a breach on the part of the state of an alleged contract between it and the complainants, is in like manner a suit against the state within the meaning of the amendment, although the state may not be named as a party defendant.

"The court does not intend to infringe upon the principle which justifies suits against individual defendants who, under the color of the authority of unconstitutional state legislation, are guilty of personal trespasses and wrongs; nor to forbid suits against officers in their official capacity either to arrest or direct their official action by injunction or *mandamus,* where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest." Without entering upon any discussion of the material distinction between this case and that of *Railroad Co.* v. *Miller,* it is manifest, and must be held, that this case does not fall within the exceptions noted in the *Ayer's Case.* The act of the auditor sought to be enjoined does not amount to a trespass or wrong to be done against the appellant, nor is the suit brought by it, to arrest the ministerial act of the auditor, one authorized by any provision of law. While the auditor is the nominal party, it is perfectly clear that the State is the real and substantial party to the controversy. The auditor has no personal interest in it whatever and a decree enjoining him in this particular would be a decree against the State, prohibiting the execution of the law, designed not only to produce State revenue, but also to control and govern corporations created by the State. In this view of the matter, the case seems to fall within

the exception made in *Railroad Co.* v. *Miller* where it is said, that a State officer cannot be restrained by injunction from the performance of a ministerial duty, if that duty is purely executive and political.

The position of the appellant, on the main question is that a corporation, being an artificial person, dwelling not in its ware houses, its depots or its ships, having its domicile in the state of its creation, irrespective of the residence of its officers or the place where its business is transacted, and the state of its creation having no power to confer upon it the right to do business in any other state, the state has no right or power to impose, upon a corporation which has its office and principal works outside of the state, a greater tax than it imposes upon another corporation of the same kind or class which has its principal place of business and chief works within the state. Appellant admits the right of the State to classify corporations for the purpose of taxation, but it insists that the classification here made in respect to it and other corporations similarly situated, is illegal and not based upon any solid ground or real distinction, and is, therefore, in violation of the last clause of said section 1 of Article X of the Constitution of this State. It very properly claims to be a West Virginia corporation, and that is admitted by counsel for the auditor.

Counsel for the appellee say that there is a very material distinction between the physical and the legal existence of a corporation and that the legislature, in marking that distinction by its classification of them into resident and non-resident domestic corporations, has taken its stand upon firm and substantial ground. Corporations which have their principal places of business and chief works outside of the State pay no taxes in this State upon their property. The manifest purpose of the legislature, in making this distinction, is to make all corporations, organized by its permission, stand as nearly as possible upon the same footing in respect to the amount of taxes paid by them in the State. There is but one way in which that can be done, and that is by imposing upon corporations, having no property in the State, an adequate franchise tax and making the existence of the corporation depend upon the payment of that tax. The property of the corporation being wholly without the State cannot be reached by any ordinary State process or proceedings to subject it to the payment of a property tax. The State has but one

remedy as to such corporations, in whatever form the tax may be assessed or estimated, and that is to make the continuance of the very life of the corporation depend upon its payment. Other corporations having their property, or a considerable portion of it, in the State, subject themselves to the ordinary proceedings for the levy, assessment and collection of taxes upon their property, and it becomes unnecessary for the State to hold in its hands their very lives as security for the payment of all the taxes which the legislature, in its wisdom and discretion, deems they ought to pay. Therefore, it requires resident corporations to pay part of their taxes in the form of a license tax, leaving the balance to be levied upon their property and collected in the ordinary way; while in the case of non-resident domestic corporations, it imposes the sole tax upon the franchise, knowing such corporations do not intend to have any property or, if any, any considerable amount of property, within the State upon which taxes may be levied and collected.

Prior to 1885 no such distinction as this was made by the laws of this State. All corporations chartered here paid the same license tax and transacted their business wherever they pleased. Under the law of comity, existing in all states of the Union and in all foreign countries, except where abrogated by positive law, West Virginia corporations might transact their business anywhere, and still remain West Virginia corporations. It is true, that in many states, by constitutional provision and legislation, the law of comity has been greatly qualified. Many of the states imposed restrictions by taxation and otherwise upon corporations other than those created by themselves, seeking to do business within their limits, and make compliance with all their regulations and conditions precedent to the right of such foreign corporations to do business within the State. It is argued here that the State, having no power to grant to one of its corporations the right to do business in another state, has no right nor power to impose a tax upon such privilege as it attempts to bestow by authorizing such corporation to keep its principal place of business or chief works outside of the State. This contention is unsound for the reason that the State, in so doing, does not grant nor attempt to grant any such privilege. It is merely dealing with its own creatures, and distinguishing between those of them which substantially confine themselves, in the transaction of their business, to the limits of the State, and those which

signify their desires not to so confine themselves but substantially to remove their business and property holdings and the residence of their officers and stockholders into that broad field of operation permitted by the law of comity. In so doing, the State does not pretend to confer any right of its creation, but simply extends to its own creatures the right to go beyond its own limits in these respects. The power of the State is sovereign and unlimited in its control in respect to what corporations it will create and what it will permit them to do, in respect to what privileges it will confer and what it will withhold. In permitting its own corporations to remove out of the State their principal places of business and chief works it does not intend to bestow any right or privilege in any territory over which another state is sovereign, but it does thereby bestow upon its own corporations a power, a permission, a privilege, which it undoubtedly has the right to withhold. If the time should ever come when no state of the Union nor any foreign country will permit such corporation to profit by such permission to go beyond the limits of the State of its own creation, the contention that such corporation derives no benefit from such permission and privilege would be perfectly logical and sound. But the State has the right to recognize conditions over which it has no control and permit a corporation of its own creation to take advantage of them and profit by them, and also the right to refuse such permission.

It is not quite accurate to say that the franchise of a corporation is its privilege to do a certain kind of business or to do business in a particular place. It covers a great deal more than that. Morawetz on Private Corporations at s. 922 says: "When the legislature grants a charter of incorporation, it confers upon the grantees of the charter the right or privilege of forming a corporate association, and of acting within certain limits in a corporate capacity, and this right or privilege is called a corporate franchise." At s. 923 Morawetz says: "What is called the franchise of forming a corporation is really but an exemption from a general rule of the common law prohibiting the formation of corporations." At s. 648 he says, "When the legislature incorporates an association for the purpose of carrying on a particular business in a particular manner, it thereby grants permission to the association to act in a corporate capacity for the purpose of prose-

cuting the particular enterprise described and no other." So it is manifest that the chief or primary right included in a corporate franchise is the right to be a corporation. This carries many privileges and exemptions. It limits the liability of the individuals composing the corporation in respect to their contracts and acts in the prosecution of the particular enterprise. It enables the collective body, without regard to the number of persons composing it, to act as one man, as well as to limit the personal liability of each individual. It permits a simple and convenient transfer of the interest of each stockholder, and relieves him of many of the great inconveniences of a co-partnership relation to his associates. The benefits flowing to the individuals from the privilege thus granted of combining and acting as a corporation in the prosecution of their business are almost innumerable. The particular business which it is proposed to transact and the place in which it is proposed to do that business are matters of inferior consequence and do not enter into the very essence of corporate existence.

It is true that Morawetz, at s. 938 says: "From the nature of a franchise it follows that it can have no force beyond the jurisdiction of the state which granted it;" and also at s. 959: "It is a fundamental principle that the laws of a state can have no binding force, *proprio vigore,* outside the territorial limits and jurisdictions of the State enacting them. Hence, it follows that a state cannot grant to any person the right to exercise a franchise in a foreign state or country." But it is also true that at s. 958 it is said: "A state cannot, by chartering a corporation, confer upon it a legal right to act within the jurisdiction of another state; but the legal right to act in a foreign state may always be extended to the corporation by the laws of such foreign state. By the common law rule, in force throughout the United States, each state extends to all duly incorporated foreign corporations the legal right to carry on business within its jurisdiction. It may, therefore, be said to be a general rule, that a corporation can legally carry on its business in the usual way and by the usual agencies wherever it may find it convenient and profitable to do so." At s. 962 it is said, "This law of comity among the states is merely the common law of each state, and as such it is obligatory upon the courts." Story's Conflict of Laws, 36 and 37, says, "In the silence of any positive rule affirming or denying or restraining the operation of foreign laws, courts of

justice presume the tacit adoption of them by their own govern-
ment, unless they are repugnant to their policy or prejudicial to
its interest. It is not the comity of the courts but the comity of
the nation, which is administered, and ascertained in the same
way and guided by the same reasoning by which all other princi-
ples of municipal law are ascertained and guided." Keeping in
mind this well established, well known principle of comity, al-
most, if not quite, universal in its application, and only re-
stricted and qualified to the extent of regulation by foreign
states, and never absolutely abrogated except as to particular
acts and particular contracts, it cannot be said that the State of
West Virginia, in recognizing it and granting permission to its
corporations, over which its control, in their creation and powers
thereby conferred, is sovereign and unlimited and unrestricted
in any sense, is recognizing or basing its permission upon a mere
shadow. A corporation created by one state can do and perform
in any other state any act or transact any business which it can
legally perform in the state of its creation, providing it be such
an act as an individual might legally perform, unless prohibited
by, or repugnant to, the laws of such other state.

The classification of corporations complained of was made in
1885. All corporations chartered prior to that time, under the
law of comity, might transact their business and keep their prin-
cipal places of business, chief works and property outside of the
state unconditionally. Upon what principle of law can it be
said that the State of West Virginia did not have the power in
1885 to say that hereafter no corporation which proposes to lo-
cate its principal place of business and chief works without this
State shall be chartered, or that any corporation, hereafter char-
tered, which shall remove its chief office and principal works
beyond the territorial limits of the State shall thereby forfeit its
charter? Corporations being mere artificial persons which the
legislature has the right to call into existence or not to create at
all, why may it not impose any restrictions or conditions it
pleases upon their creation, or annex any condition subsequent
for the purpose of forfeiting their charters upon their failure to
comply with such conditions? Who can inquire into the reasons
which the legislature shall deem sufficient for imposing such
conditions and restrictions? In the interest of the State's own
development, the legislature may deem it proper to say that
every corporation created by it shall maintain its plant, its prin-

cipal office, and hold its property within the State. If it should determine so to do, who can complain of this exercise of its sovereign power in the premises? Is there any power in the Federal government or is there any principle of Constitutional or common law by which the legislature can be controlled in this respect? Suppose that it has no better or other reason than that it is to the interest of the state that its corporations shall keep their principal places of business and chief works within the state to the end that the state's revenues shall be thereby increased. Upon what principle can it be said that if the legislature deems this a sufficient reason it has no power to so restrict its corporations? The Constitution says that the legislature shall provide for the organization of all corporations hereafter to be created, by general laws, uniform as to the class to which they relate, from which it is manifest that the Constitution recognizes the necessity of corporate organization. But it does not result from this that the legislature shall provide for the organization of any certain class of corporations or of corporations for any particular purpose. That is left wholly within the discretion of the legislature. If the legislature has the power to prevent the corporations created by it from going beyond its limits, why has it not the power to let them go beyond its limits upon their complying with certain conditions which it annexes. If it can exercise the greater power in that respect, does not that include the lesser?

Passing now from the contention of counsel for appellant, that the State, by conferring upon its permission to keep its principal place of business and chief works without the State gave it nothing in exchange for the taxes imposed, the next inquiry is whether the classification of corporations in that respect for the purpose of taxation is in violation of the last clause of section 1 of Article X of the Constitution. From what has already been said it must be apparent to all that there is a material and substantial, and not a mere fanciful, distinction between these two classes of corporations. One class pays taxes upon its franchise and also upon its property, both to the State and to the counties, districts, cities and towns in which their property is located. The other class pays no taxes upon any property, but only upon its franchise. If, therefore, the franchise tax upon both classes were the same, there would be a vast difference in the burden of taxation resting upon the two classes of corporations as regards

this State. Each is a citizen of this State, and it is not unreasonable to say that each should bear the same proportion of the burden of taxation. It is true that a corporation of that class to which the appellant belongs, may be, and no doubt is, required to pay taxes, upon its property as well as an excise tax in the state in which it carries on its business, and in some sense this would appear to be double taxation, but it is not. This State has no concern whatever with the taxes to which her corporations subject themselves in foreign states. She has the right to require of them such duties and the performance of such conditions as she sees fit to impose upon them. It is not a matter of any consequence to this State, nor anything for which it is responsible, what taxes these corporations submit themselves to in other jurisdictions. By going beyond the territorial limits of the State with their property they voluntarily make themselves liable for any tax imposed upon them beyond the territorial limits of the State. Probably every corporation, chartered in any state in the Union, pays a license tax in its own state, and yet the foreign state in which such corporation transacts business may and does impose another license tax upon it. That is double taxation in some sense but it is not so regarded or held by the courts. In Thompson's Com. Cor., s. 8087, it is said, "The rule is that, whereas the states have the power to exclude them (foreign corporations) entirely, they have the power to impose upon them such burdens, as the condition of their entering, as they may see fit." So the only question is whether in requiring corporations of the class to which appellant belongs to pay a heavier license tax than the other class, this law violates said clause of the Constitution. While that clause says the legislature shall have power to tax "by uniform and equal laws, all privileges and franchises of persons and corporations," it is admitted that in doing so the legislature may lawfully classify such privileges and franchises, and assess and collect taxes upon them in different ways and ascertain their values for the purpose of taxation by different methods, making the method and mode of taxation uniform as to each class. This principle is so well settled that it is not questioned. The only contention is that there is no difference between the two classes of corporations. There is no difference in some senses. They are all corporations of this State—all citizens of this State. They are all governed by the same law in respect to their organization and powers conferred

for the transaction of business. But, as has been clearly indicated, there is a vast difference and a most substantial one in the matter of the place of the location of the business of these two classes of corporations. One class contributes to the wealth and development of the State. The other contributes nothing in that respect. One class subjects its property to ordinary taxation within the State, the other does not. To make each bear its proper share of the burden of taxation of the state of the citizenship of each, it becomes necessary to make this classification and it is made for that purpose and no other. That is the only reason for the classification of other privileges and franchises in the matter of taxation. All such classifications are held to be legal, for uniformity and equality in the imposition of the burden of taxation can only be attained and effectuated by such classification.

Little is presented here, by way of argument, to show that there is any violation of the provision of the Constitution of the United States, prohibiting any state from passing any law impairing the obligation of a contract. This corporation obtained its charter from the state after this classification had been made. Since it obtained its charter, the State has increased the annual license tax upon it. So it only amounts to a question of whether the State has the right to increase a tax of that kind. Where a certain tax is imposed on a corporation by its charter, the legislature does not thereby disable itself from imposing upon it a different or more onerous tax in the future. Thomp. Corp. s. 5572. In this connection it is contended that the payment by this corporation of the same tax paid by resident corporations is of the essence of the contract. This is clearly a misconception, for, as has been shown, at the time this corporation obtained its charter, it was required to pay five times the amount of license tax imposed upon resident corporations. But it cannot be said that there is any contract about it. Nothing in the law, either expressly or impliedly, holds out any intimation that the rate of taxation will not be changed in the future. If the State can limit its power of taxation by contract, as it has been said that it can, as where it exempts a corporation from taxation by way of encouraging it to undertake great enterprises of the *quasi* public nature, there is clearly no contract here. Another principle of law in this connection is that all such contracts, when they do exist, are strictly construed. Thomp. Corp. s. 5571.

Lastly, it is contended that this statute, by imposing upon the class of corporations to which appellant belongs, a heavier tax than is imposed upon the other class of domestic corporations, is violative of that clause of the Fourteenth Amendment of the Constitution of the United States, providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws." In matters of taxation the only limitation put upon the power of a state to discriminate between classes of corporations in the amount of tax imposed, is that such classification must not be arbitrary, and that it must rest upon some reasonable ground or basis. JUDGE BRANNON, in his excellent work on the Fourteenth Amendment at page 323, says: "In various cases, such as tax laws, and in many other instances, the legislature may classify persons and things in the administration of government. It does not follow that because one man of one class happens to be treated by law differently from another in another class that the equality clause is violated. It only requires the same means and methods to be applied impartially to all the constituents of a class, so that the law shall operate equally and uniformly upon all persons in similar circumstances. The State may, consistently with this clause, classify subjects of taxation and apply different methods of valuation and taxation consistently with the Federal Constitution." Citing *Ky. R. R. Co. Tax Cases,* 115 U. S. 321; *Magoun* v. *Illinois,* 170 U. S. 283; *Home Co.* v. *New York,* 134 U. S. 594; *New York* v. *York Clearing House,* 179 U. S. —; *American Sugar Co.* v. *Louisiana,* 179 U. S. 89. In this connection he quotes with approval the following from Mr. Justice McKenna in *Magoun* v. *Illinois,* 170 U. S. 283: "The mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the Fourteenth Amendment, and in all cases it must appear, not merely that a classification has been made, but also that it is based on some reasonable ground—something which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection." In the course of his work numerous other citations to this effect are made, and all of them fully support the propositions he asserts. It has been shown in the course of this opinion that the classification made by this statute is not arbitrary and does not lack solid and substantial ground. In making it the State has consulted its interest, not only in the matter of taxation, but also in that of its

development and prosperity. Moreover, the appellant here had no existence until this classification was made. It came into existence by virtue of the legislation of this State and was born with the condition of which it complains attached. All other corporations standing in the same situation are subjected to exactly the same tax. It cannot be said, therefore, that this discrimination is especially against it, but only applies to its class. It cannot be said that it is merely arbitrary, a mere classification and nothing more, for the reason that the class to which it belongs in their situation, in their purposes and in their relations to the state, differ widely from the other class of corporations upon which a lighter tax is imposed. It has been frequently intimated, in the course of this opinion, that corporations are peculiarly subject to legislative control, and that is fully borne out by the authorities, and as much so in respect to taxation as in some other particulars. BRANNON, Fourteenth Amendment, page 340, says, "Considering that, corporations have privileges and franchises from the state which individuals do not possess, they may be taxed differently from individuals and by a different process." Supporting this, he quotes the following from the opinion in *Home Insurance Co.* v. *New York,* 134 U. S. 594: "But the amendment does not prevent the classification of property for taxation, subjecting one kind to one rate and another to a different rate, distinguishing between licenses, franchises and privileges, and visible and tangible property and between real and personal property. Nor does the amendment prohibit special legislation. Indeed, the greater part of legislation is special, either in the extent to which it operates or the subjects sought to be obtained. And when such legislation applies to artificial bodies, it is no objection if all such bodies are treated alike under similar circumstances and conditions in respect to the privileges conferred upon them and the liability to which they are subjected." In view of these principles, the conclusion is that said statute does not violate said amendment to the Federal Constitution.

Therefore, the decree of the circuit court, sustaining the demurrer and dismissing the bill, is right and must be affirmed.

*Affirmed.*