G. A. ABLES, *et al.*

*v.*

HARLEY F. MOONEY, JR., *Superintendent, West Virginia Department of Public Safety*

E. N. HENRY

*v.*

HARLEY F. MOONEY, JR., *Superintendent, West Virginia Department of Public Safety*

WILLIAM DAVID PLANTZ

*v.*

HARLEY F. MOONEY, JR., *Superintendent, West Virginia Department of Public Safety*

(No. 14328)

Decided October 9, 1979.

Rehearing Denied December 6, 1979.

*Chauncey H. Browning*, Attorney General, *Ellen F. Warder*, Assistant Attorney General, for plaintiff in error.

*James M. Sprouse, Riley & Yahn and Arch W. Riley* for defendant in error.

MILLER, JUSTICE:

This civil appeal presents the question of whether the provision in the West Virginia Wage and Hour Law, W. Va. Code, 21-5C-8(d),[1] permitting a two-year back recovery for unpaid wages in a civil action brought by an employee against an employer who has failed to comply with that statute, should be applied to the petitioners in this case.

The specific question presented is whether this provision requires the payment of two years' back overtime wages where the employer based his refusal to pay the wages during that time on *State ex rel. Giles v. Bonar*, 155 W.Va. 421, 184 S.E.2d 639 (1971), which held that members of the Department of Public Safety were not covered under the Wage and Hour Law.

Petitioner G. A. Ables and numerous other named persons, all active or retired Troopers or Troopers First Class of the West Virginia Department of Public Safety [herein State Troopers], filed a mandamus action in the Kanawha County Circuit Court on July 1, 1977, against the Superintendent of the Department of Public Safety [herein Superintendent].[2] By this action, the State

---

[1] "In any such action the amount recoverable shall be limited to such unpaid wages as should have been paid by the employer within two years next preceding the commencement of such action. Nothing in this article shall be construed to limit the right of an employee to recover upon a contract of employment."

[2] No issue is raised as to the validity of allowing multiple petitioners in a mandamus suit. There is a split of authority as to whether mandamus may be brought as a class action. *See* 52 Am. Jur. 2d *Mandamus* § 388. No case on this point has been decided by this Court. In *State ex rel. Crosier v. Callaghan*, ____ W.Va. ____, 236 S.E.2d 321, 322 (1977), we merely noted the multiplicity of relators without discussion. Our rule, antedating the advent of the class

Troopers sought to compel the Superintendent to pay them overtime compensation under W. Va. Code, 21-5C-8(d), for the two years preceding the commencement of the mandamus action.

The State Troopers premise their asserted right to back overtime compensation on the holding of this Court in *State ex rel. Crosier v. Callaghan,* ____ W.Va. ____, 236 S.E.2d 321 (1977). There, we held that conservation officers employed by the State Department of Natural Resources came within the coverage of the Wage and Hour Law and were eligible for overtime wages under W. Va. Code, 21-5C-1, *et seq.* This holding hinged on our overruling the prior decision of *State ex rel. Giles v. Bonar, supra,* "to the extent that *Giles* categorically denies wage and hour protections to any employee who is clothed with some official character or responsibility . . . ." [____ W.Va. at ____, 236 S.E.2d at 324].

*Giles* held that State Troopers were excluded from the ambit of the Wage and Hour Law because "police are public officers as distinguished from mere public employees." [155 W.Va. at 430, 184 S.E.2d at 644] In *Crosier,* we abandoned the "highly artificial distinction between 'public officers' and 'mere employees' " as being "without sound legal basis in wage and hour law." [____ W.Va. at ____, 236 S.E.2d at 326]

The Superintendent contends that the attempt to obtain the two years' back overtime pay is in reality a suit against the State and thus barred under Article VI, Section 35 of the West Virginia Constitution.[3] He also

---

action, is that persons having a common and joint interest may and should join together in a mandamus action, *Payne v. Staunton,* 55 W.Va. 202, 46 S.E. 927 (1904), but that persons having completely separate and distinct rights may not, *Alley v. Musick,* 68 W.Va. 523, 70 S.E. 124 (1911).

[3] "The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee."

asserts that State Troopers are, notwithstanding *Crosier*, outside the purview of the Wage and Hour Law, or, if they are covered by that statute, that he is not liable for two years' back wages because he had relied on our decision in *Giles*, which specifically excluded State Troopers from the coverage of the statute.

The Superintendent concedes that his reliance on *Giles* would end at the time we issued our overruling decision in *Crosier* on May 17, 1977. He argues that he could not have reasonably anticipated the result in *Crosier* and therefore is not liable for the two years of unpaid overtime wages. It is not disputed that, immediately upon the issuance of the *Crosier* decision, the Superintendent made Troopers and Troopers First Class eligible for overtime compensation under the Wage and Hour Law. The Circuit Court concluded that the Superintendent was liable for two years of unpaid overtime wages. For reasons set out below, we hold that he is not.

I

At the threshold, it is important to state those matters we find unnecessary to decide in this case.

As of July 1, 1978, the Legislature amended the wage provisions of the West Virginia Department of Public Safety Reorganization Act, W. Va. Code, 15-2-1, *et seq.*, to exclude State Troopers from the coverage of the Wage and Hour Law and to place them under special "supplemental pay" provisions for overtime work. W. Va. Code, 15-2-5. This section as amended expressly provides that this exclusion is prospective only and has no effect on the present case.[4]

---

[4] W. Va. Code, 15-2-5, states in relevant part:

"The legislature finds and declares that there is litigation pending in the circuit court of Kanawha county on the question whether members of the department of public safety are covered by the provisions of the state wage and hour law, article five-C [§ 21-5C-1 et seq.], chapter twenty-one of this Code. The legislature further finds and declares that because of the unique duties of members of the department, it is not appropriate to apply said wage and hour provisions to them. Accordingly, members of the department of

Because this amendatory legislation prospectively excludes State Troopers from the ambit of the Wage and Hour Law, the question of the coverage of the Troopers in the present case after July 1, 1978, is moot. *See Fusari v. Steinberg*, 419 U.S. 379, 42 L. Ed. 2d 521, 95 S.Ct. 533 (1975). Moreover, since the Superintendent complied with the overtime provisions of the Wage and Hour Law from the date of *Crosier*, May 17, 1977, this suit does not involve any claim for violation of the Wage and Hour Law since that date.

Therefore, the only issue in this case is whether the two-year back pay requirement of W. Va. Code, 21-5C-8(d), applies retroactively from the date of *Crosier*. Since the Legislature, as of July 1, 1978, removed State Troopers from the provisions of the Wage and Hour Law, and from that date back to the date of *Crosier* the Superintendent complied with the Wage and Hour Law, we need not address the question of whether the State Troopers were, in fact, covered by the Wage and Hour Law prior to July 1, 1978.

In sum, we need only decide, assuming arguendo that the State Troopers were covered by the Wage and Hour Law prior to July 1, 1978, if they are entitled to the two-year back pay award under the particular facts of this case.

---

public safety are hereby excluded from the provisions of said wage and hour law. The express exclusion hereby enacted shall not be construed as any indication that such members were or were not heretofore covered by said wage and hour law.

"In lieu of any overtime pay they might otherwise have received under the wage and hour law, and in addition to their salaries and increases for length of service, members who have completed basic training may receive supplemental pay as hereinafter provided.

. . . .

"The supplemental payment shall be in an amount equal to one and one-half percent of the annual salary of a trooper during his second year of service, not to exceed one hundred seventy-five dollars monthly. The superintendent and civilian employees of the department shall not be eligible for any such supplemental payments."

## II

The Superintendent urges that this mandamus constitutes a suit against the State and is therefore barred under the provisions of Article VI, Section 35 of the West Virginia Constitution. The State Troopers argue that it is a recognized principle of our law that a suit in mandamus will lie against a State official to compel him to discharge a nondiscretionary duty. *State ex rel. Bache & Co. v. Gainer*, 154 W.Va. 499, 177 S.E.2d 10 (1970); *State ex rel. Clark v. Dadisman*, 154 W.Va. 340, 175 S.E.2d 422, (1970); *State ex rel. Judy v. Kiger*, 153 W.Va., 764, 172 S.E.2d 579 (1970); *State ex rel. Printing-Litho, Inc. v. Wilson*, 147 W.Va. 415, 128 S.E.2d 449 (1962).

Without embarking on an extended discussion of the several aspects of our constitutional doctrine of sovereign immunity,[5] we can state that it has never been extended to bar all suits against State officials. One of the earliest and best statements regarding the applicability of our constitutional immunity doctrine to State officials is found in Syllabus Point 3 of *Blue Jacket Consolidated Copper Co. v. Scherr*, 50 W.Va. 533, 40 S.E. 514 (1901):

"State officers who, under the color of the authority of unconstitutional state legislation, are

---

[5] We are not concerned with tort immunity, *see Torts—Governmental Immunity in West Virginia—Long Live the King?*, 76 W.Va. L. Rev. 543 (1974), but with our constitutional immunity in suits against State officials which do not involve damage claims against them. *See Immunity of State Agency from Suit*, 43 W.Va. L.Q. 66 (1936); *see also* Davis, *Sovereign Immunity in Suits Against Officers for Relief Other Than Damages*, 40 Cornell L.Q. 3 (1954); Note, *The Sovereign Immunity of the States: The Doctrine and Some of Its Recent Developments*, 40 Minn. L. Rev. 234 (1956). As to what type of entity may invoke the constitutional immunity defense, see *Woodford v. Glenville State College Housing Corp.*, ____ W.Va. ____, 225 S.E.2d 671 (1976). The constitutional immunity as to suits against the State is to be distinguished from the common law doctrine of sovereign immunity, which can be abrogated by the Legislature, *Boggs v. Board of Education*, ____ W.Va. ____, 244 S.E.2d 799 (1978), or by the Court through its evolution of common law principles, *Morningstar v. Black & Decker Mfg. Co.*, ____ W.Va. ____, 253 S.E.2d 666 (1979).

> guilty of personal trespasses and wrongs, may be sued, although the Constitution of this State provides that the State shall never be made defendant in any suit at law or in equity; and suits may be maintained against such officers in their official capacity, to arrest or direct their official action, by injunction or *mandamus*, when said suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest; but in other cases such suit cannot be maintained when such officer is only a nominal party, for such suit is then tantamount to a suit against the State." [Emphasis in original]

The conventional reason for permitting such suits is that where a State official is acting unlawfully or unconstitutionally, he is acting beyond the scope of his office, and the suit is against him as as individual and not against the State. *See, e.g., Coal & Coke Railway Co. v. Conley*, 67 W.Va. 129, 67 S.E. 613 (1910).

The rationale for permitting a writ of mandamus to require a State official to perform a nondiscretionary duty has not often been articulated in relation to our constitutional immunity provision. Typifying this approach is *State ex rel. Printing-Litho, Inc. v. Wilson, supra*, where, after citing a number of cases which have permitted mandamus actions, the Court concluded.

> "The principle to be derived from these cases is that an action or suit instituted by a person entitled to the performance of a duty against the official charged with the performance of that duty is not a suit against the state within the prohibition of Section 35, Article VI of the Constitution of this State. . . ." [147 W.Va. at 420, 128 S.E.2d at 452]

While permitting a mandamus action against a State official, other cases have avoided any discussion of the constitutional immunity bar and have rested their holdings on the general rule that: "Mandamus lies to require the discharge by a public officer of a nondiscretionary

duty." Syllabus Point 1, *State ex rel. C. J. Langenfelder & Son, Inc. v. Ritchie*, 154 W.Va. 825, 179 S.E.2d 591 (1971); *see, e.g., Walls v. Miller*, ____ W.Va. ____, 251 S.E.2d 491 (1978); *Mountaineer Disposal Service, Inc. v. Dyer*, 156 W.Va. 766, 197 S.E.2d 111 (1973); *Walter v. Ritchie*, 156 W.Va. 98, 191 S.E.2d 275 (1972).

From a practical standpoint, much the same reasoning can be applied to the foregoing cases as was used by the Court in *Blue Jacket* and *Coal & Coke Railway*, that, by refusing to perform his nondiscretionary duty, the State Official is acting in an unlawful manner, and in this sense is not acting within the scope of his office and, therefore, the suit is against him as an individual and not against the State.

Yet, even this analysis does not completely answer the constitutional immunity question. This Court has also looked behind the formal parties in the suit and made some assessment of the suit's impact on the State. Thus, in *Hamill v. Koontz*, 134 W.Va. 439, 59 S.E.2d 879 (1950), we struck down, as violative of Article VI, Section 35 of the West Virginia Constitution, a statute which authorized a taxpayer to sue the State Tax Commissioner for recovery of improperly charged taxes, stating:

> "A suit against an officer of the State who acts or threatens to act under an unconstitutional statute, with the enforcement of which he is charged, is a suit against him in his individual capacity, as for a wrong done by him, and not against the State; but if a suit directly involves a contract right or liability on the part of the State government or property belonging to it or in its custody it is deemed to be a suit against the State. See *Coal and Coke Railway Company v. Conley and Avis*, 67 W.Va. 129, 67 S.E. 613. . . ." [134 W.Va. at 444, 59 S.E.2d at 882]

In *City of Morgantown v. Ducker*, 153 W.Va. 121, 168 S.E.2d 298 (1969), this Court concluded that a claim for back city taxes against the Board of Governors of West Virginia University could only be brought in the State Court of Claims, since the Board was shielded by consti-

tutional immunity. *Ducker* cited a number of earlier cases where suits involving monetary claims against State agencies were rejected on immunity grounds, and concluded:

"The opinion in the *Hamill* case also contains this quotation from 49 Am. Jur., States, Territories and Dependencies, Section 92: 'While a suit against state officials is not necessarily a suit against the state, within the rule of immunity of the state from suit without its consent, that rule cannot be evaded by bringing an action nominally against a state officer or a state board, commission, or department in his or its official capacity when the real claim is against the state itself, and the state is the party vitally interested. If the rights of the state would be directly and adversely affected by the judgment or decree sought, the state is a necessary party defendant, and if it cannot be made a party, that is, if it has not consented to be sued, the suit is not maintainable. The state's immunity from suit without its consent is absolute and unqualified, and a constitutional provision securing it is not to be so construed as to place the state within the reach of the process of the court.' ..." [153 W.Va. at 129-30, 168 S.E.2d at 303]

The issue here is analogous to that considered in *Edelman v. Jordan*, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S.Ct. 1347 (1974), where the Court considered the validity of certain Illinois welfare regulations and determined that they were inconsistent with their federal counterparts. Although affirming prospective injunctive relief to compel the Illinois state officials to comply with the federal regulations, the Court declined to grant retroactive monetary relief on the basis that such relief was barred by the Eleventh Amendment to the United States Constitution as a suit against the state:

"While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of

damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.

"Were we to uphold this portion of the District Court's decree, we would be obligated to overrule the Court's holding in *Ford Motor Co.* v. *Department of Treasury, supra.* There a taxpayer, who had, under protest, paid taxes to the State of Indiana, sought a refund of those taxes from the Indiana state officials who were charged with their collection. The taxpayer claimed that the tax had been imposed in violation of the United States Constitution.... Yet this Court had no hesitation in holding that the taxpayer's action was a suit against the State, and barred by the Eleventh Amendment. We reach a similar conclusion with respect to the retroactive portion of the relief awarded by the District Court in this case." [415 U.S. at 668-69, 39 L. Ed. 2d at 676, 94 S.Ct. at 1358]

It can be seen from the foregoing discussion that our constitutional immunity provision does not forbid suits against State agencies or officials where the claim is made that they are acting unconstitutionally or beyond their lawful powers, or have failed to perform a nondiscretionary duty imposed on them by law. In this type of suit, the issue centers on a declaration of the legality or legitimacy of their conduct. In this sense, the inquiry focuses on whether their action is beyond the legitimate scope of their office, and they become amenable to suit because the claim is that they have acted in a nonofficial capacity.

It may thus be said that in certain instances a suit may be maintained against a State official in his individual capacity, notwithstanding the constitutional immunity provision found in Article VI, Section 35 of the West Virginia Constitution, where the relief sought involves a

prospective declaration of the parties' rights. However, where the relief sought involves an attempt to obtain a retroactive monetary recovery against the official based on his prior acts and which recovery is payable from State funds, the constitutional immunity provision bars such relief.[6]

In the present case, the issue is whether the Superintendent is required to pay back overtime wages for the two-year period. There is no dispute that such an award would be paid from State funds, and is similar to any other monetary recovery. Such an award is indistinguishable on constitutional immunity grounds from the claim for improperly charged taxes rejected in *Hamill* or the claim for back city taxes levied against the West Virginia University Board of Governors which this Court rejected in *Ducker*. While it is true that in *Crosier* the back pay authorized by W. Va. Code, 21-5C-8(d), was awarded, no consideration was given to the constitutional bar of governmental immunity. This issue, therefore, cannot be deemed foreclosed by *Crosier*. We conclude that the award of any retroactive monetary claim in this case is precluded by Article VI, Section 35 of our Constitution.

---

[6] Cases involving suits against the State Auditor for failing to pay requisitions submitted by State agencies or officials follow a similar analysis. Although they involve monetary payments, these payments are based upon warrants or requisitions submitted by a State agency or official pursuant to a budget appropriation. The issue in these cases is whether the expenditure was lawful in the context of the applicable law surrounding the appropriation. If found lawful, no *new* appropriation is created. *See, e.g., State ex rel. Bache & Co. v. Gainer*, 154 W.Va. 499, 177 S.E.2d 10 (1970); *State ex rel. Board of Governors v. Sims*, 140 W.Va. 64, 82 S.E.2d 321 (1954); *State ex rel. West Virginia Board of Education v. Sims*, 139 W.Va. 802, 81 S.E.2d 665 (1954); *State ex rel. Roth v. Sims*, 139 W.Va. 795, 81 S.E.2d 670 (1954); *State ex rel. West Virginia Commission on Interstate Cooperation v. Sims*, 135 W.Va. 257, 63 S.E.2d 524 (1951). Insofar as the constitutional immunity issue is concerned in this type of case, it can be asserted that where the Auditor rejects payment of a lawful warrant or requisition, he is acting outside his official function and is therefore not cloaked with constitutional immunity.

## III

Even if we were to put aside the argument of governmental immunity, we do not find that *Crosier* would compel a recovery of back pay for the State Troopers in the present case, in light of the Superintendent's reliance on the *Giles* opinion and our principles of judicial retroactivity.

In *Bradley v. Appalachian Power Company*, ____ W.Va. ____, 256 S.E.2d 879 (1979), we discussed at some length the question of judicial retroactivity, and stated in Syllabus Point 5:

> "In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions."

*Bradley* also considered our early case of *Falconer v. Simmons*, 51 W.Va. 172, 41 S.E. 193 (1902), which followed traditional common law concepts in determining that a

case overruling an earlier decision becomes fully retroactive. In fashioning a broader rule on retroactivity, we stated in Note 21 of *Bradley:* "We believe the test set out in *Falconer v. Simmons,* 51 W.Va. 172, 41 S.E. 193 (1902), as to retroactivity, is too narrow." [___ W.Va at ___, 256 S.E.2d at 889] We also made this observation about Falconer:

> "However, even *Falconer* recognized an exception to this rule: Where a prior case has construed a statute and a valid contract has been entered into on reliance upon this construction of the statute, 'the later decision does not retroact so as to invalidate such contract.' [Syllabus Point 2 in part]" [___ W.Va. ___, 256 S.E.2d at 887]

Even under *Falconer's* broad retroactivity rule, which we narrowed in *Bradley,* it could well be determined that this Court's original construction of the Wage and Hour Law in *Giles* settled an aspect of the State Troopers' employment contract. Consequently, when *Giles* was overruled in *Crosier,* which placed a new construction on the statute, that decision could not operate retroactively to vitiate the payments already made on the employment contracts. The rationale for denying retroactivity under the *Falconer* exception is that contractual rights formed on the basis of a case construction of a statute will not be retroactively impaired when the case construing such statute is subsequently overruled.

We have carried this same idea into our new retroactivity test in *Bradley,* where we stated: "If the issue involves a traditionally settled area of the law, such as contracts ... then retroactivity is less justified...." And, "[W]here ... substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored...." [Syllabus Point 5 in part, ___ W.Va at ___, 256 S.E.2d at 880-81]

The United States Supreme Court has recognized much the same rule in *United States v. Estate of Donnelly,* 397

U.S. 286, 295, 25 L. Ed. 2d 312, 319, 90 S.Ct. 1033, 1038 (1970):

> "In rare cases, decisions construing federal statutes might be denied full retroactive effect, as for instance where this Court overrules its own construction of a statute, cf. Simpson v. Union Oil Co., 377 US 13, 25, 12 L Ed 2d 98, 107, 84 S Ct 1051 (1964),..."

This concept was further expanded upon in *Lemon v. Kurtzman*, 411 U.S. 192, 36 L. Ed. 2d 151, 93 S.Ct. 1463 (1973) [*Lemon* II], where the Court considered whether it should enjoin payment by the State of Pennsylvania of some $24 Million set aside to reimburse private sectarian schools for educational services rendered during the 1970-1971 academic year.

In an earlier opinion rendered on June 28, 1971, the Supreme Court had held that the Pennsylvania statutes which reimbursed private sectarian schools for certain secular educational services violated the Establishment Clause of the First Amendment to the United States Constitution. *Lemon v. Kurtzman*, 403 U.S. 602, 29 L. Ed. 2d 745, 91 S.Ct. 2105 (1971) [*Lemon* I].

On remand, the federal district court refused to enjoin payment of the $24 Million and limited *Lemon I* to prospective operation only, by enjoining any future payments after the date *Lemon I* was decided. In upholding the district court in *Lemon II*, the Supreme Court gave primary recognition to the reliance factor:

> "Offsetting the remote possibility of constitutional harm from allowing the State to keep its bargain are the expenses incurred by the schools in reliance on the state statute inviting the contracts made and authorizing reimbursement for past services performed by the schools. It is well established that reliance interests weigh heavily in the shaping of an appropriate equitable remedy. City of Phoenix v Kolodziejski, 399 US 204, 26 L Ed 2d 523, 90 S Ct 1990 (1970); Cipriano v City of Houma, 395 US 701, 23 L Ed 2d 647, 89 S Ct 1897 (1969); Allen v State Board of Elections, 393

US 544, 22 L Ed 2d 1, 89 S Ct 817 (1969)." [411 U.S. at 203, 36 L. Ed. 2d at 163, 93 S.Ct. at ____]

The Court's holding was predicated on its conclusion that *"Lemon I* 'decid[ed] an issue of first impression whose resolution was not clearly foreshadowed.' Chevron Oil Co. v. Huson, 404 U.S., at 106, 30 L. Ed. 2d 296, 92 S.Ct. at 355." [411 U.S. at 206, 36 L. Ed. 2d at 164, 93 S.Ct. at ____] It concluded with this summary:

> "In short, the propriety of the relief afforded appellants by the District Court, applying familiar equitable principles, must be measured against the totality of circumstances and in light of the general principle that, absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful." [411 U.S. at 208-209, 36 L. Ed. 2d at 166, 93 S.Ct. at ____]

Here, the reliance factor is even more forceful. No one could reasonably argue after this Court's unanimous opinion in *Giles* that any overtime payments could be made to State Troopers. Indeed, had a State Police Superintendent made such payment following *Giles*, he would have been subject, under W. Va. Code, 6-6-1, to removal from office for "the willful waste of public funds." *Wysong v. Walden*, 120 W.Va. 122, 52 S.E.2d 392 (1938).

To now compel the Superintendent to expend public funds for overtime obligations that he could not have lawfully paid after *Giles*, and when he had no inkling that he might be required to pay such funds until the decision in *Crosier*, elevates judicial fiat at the expense of basic principles of fairness and common sense.

It can hardly be contested that prior to *Crosier*, the parties to this action could not have anticipated that *Giles* would be overruled. It is true that *Crosier* determined that *Giles* rested on a mistaken premise, but this is nothing more than a recognition that *Crosier* overruled the previous construction of the Wage and Hour

Law. The important point is that, in overruling *Giles*, *Crosier* marked a radical departure from the construction of the Wage and Hour Law. It is the impact of this radical departure made by *Crosier* that we must assess under our retroactivity rule. The focus in a retroactivity issue is the impact of the overruling decision on the old law.

In *Crosier* neither party raised any question regarding the two-year back pay provision, undoubtedly because it could not be foreseen that *Crosier* would overrule *Giles*. Consequently, we had no occasion in *Crosier* to discuss the issue now before us. In this respect *Crosier*, in altering a construction of the statute, is similar to *Lemon I*. In both cases, the Court was not called upon to decide the retroactivity question. In *Lemon II*, the Supreme Court was directly confronted with the retroactivity question arising out of *Lemon I*, and we, in the present case, are confronted with the same question arising out of *Crosier*.

The fact that the petitioners in *Crosier* received two years' back pay under the Wage and Hour Law does not establish any such legal right for the State Troopers in this case, for, as we have pointed out, the retroactivity issue was neither raised nor discussed in *Crosier*.

In discussing our retroactivity rule in *Bradley*, we stated that the factors to be considered do not always remain constant in importance:

> "In the present case, we are confronted with fashioning a retroactivity rule in regard to a civil case. There are various factors which should be taken into consideration in resolving the question of retroactivity. In any attempt to list factors, it should be stressed that not all factors always carry the same weight, for the weight of any given factor may vary with the facts of a given case." [____ W. Va. at ____, 256 S.E.2d at 888-89]

Of the various factors listed in Syllabus Point 5 of *Bradley*, the first three are only marginally involved.

The critical impact of *Crosier* as an overruling decision is that it radically altered the statutory interpretation in *Giles* of the Wage and Hour Law. The change involves a substantial public issue in the sense that substantial public funds are at stake.[7]

In concluding that petitioners in this case are not entitled to benefit retroactively for the two-year period preceding the date of the *Crosier* decision, we do not mean to imply that other employers can avoid the two-year provision of W. Va. Code, 21-5C-8(d), once they are found to be liable for a violation of the Wage and Hour Law. The result in this case is predicated on the fact that until the *Crosier* opinion, the Superintendent could reasonably rely on the holding of this Court in *Giles*, that State Troopers were not covered by the Wage and Hour Law.

We conclude that under the holding in *Giles* and prior to *Crosier*, the Superintendent could not have applied the provisions of the Wage and Hour Law to State Troopers. To now require retroactive compliance not only entirely destroys the reliance concept, but seriously erodes the principle of fairness which underlies the doctrine of retroactivity.

For the foregoing reasons, the judgment of the Circuit Court of Kanawha County is reversed.

*Reversed.*

HARSHBARGER, JUSTICE, *dissenting:*

I would affirm the judgment of the Circuit Court of Kanawha County that under *State ex rel. Crosier v. Callaghan*, W. Va., 236 S.E.2d 321 (1977) state police troopers

---

[7] We are informed that another mandamus proceeding seeking similar relief for other members of the Department of Public Safety is pending in the Circuit Court of Kanawha County. We are not informed as to the impact of *Crosier* on other law enforcement officials or quasi-governmental officials, whose rights to overtime pay were foreclosed under *Giles'* interpretation of the word "officer."

are entitled to be paid for their overtime hours, and would make this ruling fully retroactive.

*Crosier* involved conservation officers employed by the Department of Natural Resources and overruled *State ex rel. Giles v. Bonar*, 155 W. Va. 421, 184 S.E.2d 639 (1971) wherein we found state policemen not to be entitled to the benefits of the state wage and hour law, *W. Va. Code*, 21-5C-1 *et seq.*, to the extent that it held that any employee having "some official character or responsibility" was excluded from that law.

I need not reiterate *Crosier's* reasoning. It applies to members of the Department of Public Safety, unless there are peculiarities that make troopers first class[1] professional, administrative or executive employees, and, as such, not protected by the law.

In *Crosier* we set out *"West Virginia Minimum Wages and Maximum Hours Standards Regulations"* describing duties and qualifications of professional, administrative or executive employees exempt from coverage. 236 S.E.2d at 324-25. The exemptions must be narrowly construed, *Brennan v. Southern Productions, Inc.*, 513 F.2d 740 (6th Cir. 1975), and unless *all* exempting criteria are met an employee is protected. *Hodgson v. Barge, Waggoner & Sumner, Inc.*, 377 F. Supp. 842 (M.D. Tenn. 1972), *Aff'd*, 477 F.2d 598 (6th Cir. 1973).

The West Virginia Department of Public Safety is governed by *Code*, 15-2-1 *et seq.* Its superintendent serves as the executive and administrative head of the department and chooses deputy supervisors. Persons enlisting must be between the ages of twenty-one and thirty, of sound constitution and good moral character. They must pass mental and physical examinations and successfully

---

[1] Congress amended the Fair Labor Standards Act in 1974 to extend coverage to state law enforcement personnel, Act of Apr. 8, 1974, Pub. L. No. 93-259, 88 Stat. 55; however, these amendments were held unconstitutional in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *See*, n. 1, *State ex rel. Crosier v. Callaghan*, W. Va., 236 S.E.2d 321 at 325 (1977).

complete a training program. There are no specialized education requirements.

Members are empowered to make arrests only upon a warrant or when they witness a crime. They may serve criminal process, investigate crime and take affidavits. They are forest patrolmen and game and fish wardens. They may make complaints and procure warrants. No member may interfere with property rights except for prevention of crime, nor may they be politically active or aid either party in a labor dispute.

The department's retirement board must retire any member who is fifty-five years old and has completed twenty-five years of service and also must retire any member who petitions for retirement and has twenty-five years of sevice or is fifty years old and has twenty years' service or is under fifty and has twenty years' service without military service credit. A member retired under those provisions may be recalled to active duty if he or she consents. Retirement of permanently disabled members is also permissible.

Nothing in the statute makes troopers and troopers first class professionals, executives or administrators. Labor department regulations define the terms: All three categories require that an employee regularly exercise discretion in his or her work. *Regulation 301-6(a)(1), (b)(3), (c)(1)*. Most employees including troopers and troopers first class exercise some discretion doing their work, but consistent or regular discretionary activities are necessary if one is to be classified according to the regulation, as professional, executive or administrative. A trooper or trooper first class has specific duties and powers, most of which are not subject to independent interpretation by him or her.

A "professional's" primary duty must require knowledge "customarily acquired by a prolonged course of specialized intellectual instruction", *Regulation 301-6(a)(1)*, and his work must be "predominantly intellectual". *Regulation 301-6(a)(4)*. Troopers and troopers first class are not required to have specialized intellectual instruction

except a brief, though intensive, department training course. Their primary work, routine law enforcement, is not "predominately intellectual". They are professional according to common understanding of the term, but not according to the detailed definition in the regulations which, we reiterate, must be met on all points.

"Executives" must be managers who direct the work of others and have firing or hiring influence. *Regulation 301-6(b)*. Troopers and troopers first class do not manage the department or any division and have no authority over other members.

"Administrative employees" must do primarily non-manual work directly related to policy. *Regulation 301-6(c)*. I believe troopers and troopers first class do not fit this definition.[2]

For what period are troopers and troopers first class entitled to overtime compensation?

Clearly they cannot recover for work done after June 30, 1978, because the Legislature amended *Code*, 15-2-5 effective July 1, 1978, to specifically exclude Department

---

[2] I find no other state decisions directly on point; however, a few are helpful. In *City of Billings v. Smith*, 158 Mont. 197, 490 P.2d 221 (1971), the Supreme Court of Montana found that police were exempt as professional employees but cited no administrative or statutory definition of "professional" relying instead on legislative intent and the general meaning of the term. We find the results in *State v. Boykin*, 109 Ariz. 289, 508 P.2d 1151 (1973), and *Ferrara v. State of Louisiana*, 351 F. Supp. 265 (E.D. La. 1972) more reasonable. In *Boykin*, the Supreme Court of Arizona found no statutory authorization for payment of overtime compensation to state law enforcement officers since the Arizona statute, A.R.S. § 23-391(A), only applied to "manual or mechanical labor" but they did grant the officers compensatory time off because "it seems clearly unfair to require the law enforcement officers to work longer [than eight hours per day] without some compensatory measure." 109 Ariz. at 294, 508 P.2d at 1156. In *Ferrara*, the issue was whether the legislature had approved and appropriated funds for state troopers' overtime and the United States District Court held that even if the involved statute was invalid the troopers might have reasonably relied on it and be entitled to recovery in quantum meruit for their overtime work.

of Public Safety members from the benefits of the wage
and hour law, providing supplemental pay instead.[3]
These mandamus petitions were filed in the Kanawha
County Circuit Court on July 1, 1977; therefore no over-
time compensation would be recovered for work done
before July 1, 1975, because of the two year statute of
limitation in *Code*, 21-5C-8(d):

> In any ... action [to recover a claim under the
> wage and hour law] the amount recoverable shall
> be limited to such unpaid wages as should have
> been paid by the employer within two years next
> preceding the commencement of such action.

Overtime worked between July 1, 1977 and June 30,
1978 should be compensable because our decision should
relate back to the original filing and both past and fu-
ture overtime compensation was specifically demanded.
How much, if any, of overtime worked between July 1,
1975 and July 1, 1977 would be compensable? The answer
in my judgment depends on whether this holding applies
retroactively considering *Giles'* existence and, if so, to
what extent.

Until very recently no West Virginia policy on civil
retroactivity had been adopted except Syllabus Pt. 2 of
*Falconer v. Simmons*, 51 W. Va. 172, 41 S.E. 193 (1902):

---

[3] *W. Va. Code*, 15-2-5 currently provides, in pertinent part:

The legislature finds and declares that there is litigation
pending in the circuit court of Kanawha county on the question
whether members of the department of public safety are cov-
ered by the provisions of the state wage and hour law, article
five-C [§21-5C-1 et seq.], chapter twenty-one of this Code. The
legislature further finds and declares that because of the
unique duties of members of the department, it is not appropri-
ate to apply said wage and hour provisions to them. According-
ly, members of the department of public safety are hereby
excluded from the provisions of said wage and hour law. The
express exclusion hereby enacted shall not be construed as any
indication that such members were or were not heretofore cov-
ered by said wage and hour law.

In lieu of any overtime pay they might otherwise have re-
ceived under the wage and hour law, and in addition to their
salaries and increases for length of service, members who have
completed basic training may receive supplemental pay as
hereinbefore provided.

> An overruled decision is regarded not law, but the law as given in the later case is regarded as having been the law, even at the date of the erroneous decision. To this rule there is one exception, that where there is a statute, and a decision giving it a certain construction, and there is a contract valid under such construction, the later decision does not retroact so as to invalidate such contract.

We are free to adopt whatever rule of civil retroactivity we deem wise. *Great Northern Railway Company v. Sunburst Oil & Refining Company*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). In *Bradley v. Appalachian Power Co.*, W. Va. ____ S.E.2d ____ (filed July 10, 1979), we discussed the applicable United States Supreme Court cases, *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), and concluded that "while general guidelines can be evolved to determine whether retroactive or prospective application should be given to an overruling decision, it is difficult to etch them with precision so that they will fit all cases." W. Va., ____ S.E.2d at ____. We determined what factors should be considered stressing that the weight given any factor depends on the facts of each case.

> Retroactivity of an overruling decision is designed to provide equality of application to the overruling decision because its new rule has been consciously designed to correct a flawed area of the law. *The more egregious the error, the greater the need to extend the benefits of the overruling decision to others occupying the same status . . . .*

> Counterbalancing this factor are several considerations. First, the nature of the substantive issue overruled must be determined. If the issue volves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed,

then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is more likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, we will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions. W. Va., ____ S.E.2d at ____. [My emphasis]

Applying these factors to this case, and considering those that are anti-retroactivity first:

(1) We are not dealing with an issue of well-settled property or private contract law which deserves narrow retroactive treatment to insure stability. Citizens should be able to rely on our decisions in structuring their day to day life; however, here only the government can claim reliance.

Requiring public employees to work more than forty-two hours per week without budgetary worries by the government—extracting free labor from them—is not the kind of reliance *stare decisis* envisages.

Certainly no reliance after *Crosier* can be claimed. One day after that decision, the superintendent issued a notice allowing troopers and troopers first class overtime compensation. We commend the director's speedy compliance.

(2) Our holding is substantive rather than procedural; therefore, retroactivity is negated somewhat.

(3) *Giles* had narrow impact affecting only one distinct group and the government. Applying our holding retroactively would not directly affect anyone outside the government, and its internal effect would be upon the budget.

(4) Our decision is based on statutory construction but it is not a substantial public issue with widespread ramifications. The question will probably never again confront us.

(5) A radical departure from *Giles*, but not from *Crosier*, is evident.

(6) We find no other cases which specifically address the retroactivity of overtime compensation awards; however, *Crosier, State v. Boykin, supra* n. 3, and *Ferrara v. State of Louisiana, supra* n. 3, all assumed retroactive application without discussion. Furthermore, *Code*, 21-5C-8(d)[4] specifically allows recovery back two years. Refusing retroactivity emasculates *Code*, 21-5C-8(d) which the *legislature* designed to allow back pay to people wrongfully deprived of wage and hour benefits.

I would reiterate that principal which surely supports retroactivity here: "Retroactivity of an overruling decision is designed to provide equality of application to the overruling decision because its new rule has been consciously designed to correct a flawed area of the law." Syllabus Pt. 4, *Bradley v. Appalachian Power Co., supra.*

Fairness of "equality of application" must be considered. It is patently inequitable to allow other state employees (e.g. conservation officers in *Crosier*) to recover back wages and deny *because of our error*, recovery to police officers who have worked just as hard. They put in long hours, had a right to be paid, and we should not

---

[4] *W. Va. Code*, 21-5C-8(d) provides:

In any such action the amount recoverable shall be limited to such unpaid wages as should have been paid by the employer within two years next preceding the commencement of such action. Nothing in this article shall be construed to limit the right of an employee to recover upon a contract of employment.

deny them that right because we erred egregiously in *Giles*.

Basic fairness outweighs any reason for nonretroactivity discovered in the other six factors, and therefore I would make this ruling fully retroactive.

The majority has simply misplaced its equities, and the resultant denial of recovery to the officers takes deserved wages from those the government wronged, relying on our wrong decision in *Giles*.

I perceive no reason why these claimants cannot pursue recovery in the Court of Claims. As the President of this Court wrote in *Slack v. Jacob*, 8 W. Va. 612 (1875), discussing Sec. 38 of Article VI of the West Virginia Constitution which prohibits legislative payment of any claim hereafter created against the State under any agreement made without express authorization of law: "It does not apply to claims predicated upon simple justice and right...." 8 W. Va. at 633.

My Brother McGraw joins with me in this dissent.