CECIL E. WALTER

*v.*

WILLIAM S. RITCHIE, JR., *Commissioner of the West Virginia Department of Highways*

(No. 13206)

Submitted May 16, 1972.     Decided September 6, 1972.

*Patricia Valentino,* for relator.

*Hershel R. Hark,* Legal Division, Department of Highways, for respondent.

HADEN, JUDGE:

This is an originial application by petitioner, Cecil E. Walter, for a writ of mandamus to compel the Commissioner of the West Virginia Department of Highways, hereinafter referred to as the commissioner, to issue to the petitioner a renewal license to operate a salvage yard as required by Section 3, Article 23, Chapter 17, W. Va. Code, 1931, as amended. The rule, granted April 24, 1972, was returnable May 16, at which time the case was submitted for decision upon the pleadings, briefs and oral arguments in behalf of the respective parties.

The undisputed facts are these: The petitioner has operated a salvage yard known as the Elm Grove Auto Parts Company located in the Mar-Win Addition of Elm Grove, an unincorporated and unzoned community composed of 90% residential dwellings and five businesses other than petitioner's, situate in Marshall County, West Virginia. The salvage yard is completely outside the corporate boundaries of any municipality and is not within 1,000 feet of the right of way of any road incorporated within the state or federal highway system, nor within 300 feet of the right of way of a state local service road. The commissioner admits that the salvage yard operation

complies with Article 23, Chapter 17, Code, 1931, as amended, hereinafter referred to as the salvage yard statute, as well as the rules and regulations of the Department of Highways relating to the operation of salvage yards adjacent to state highways.

Petitioner was first issued a license to operate the business in 1970 and it was renewed by the commissioner for 1971. However, his request for renewal of the license for the year 1972 was refused by the commissioner on the ground that the salvage yard was an unsightly place and detracted from the surrounding community. After seeking further explanation for the refusal, the petitioner was informed by letter of March 21, 1972 that the commissioner knew no reason to alter his previous decision. The commissioner's answer filed in this proceeding alleges that his refusal is the proper exercise of his discretion for the reasons that an investigation of complaints contained in a petition signed by more than 100 residents in the community disclosed that the presence of the petitioner's salvage yard detracted from the aesthetic beauty of the neighborhood, constitutes a health hazard, prevents the uninterrupted enjoyment of the general health, prosperity and comfort of the community and therefore is a public nuisance.

Does the highway commissioner, in the lawful exercise of the power reposed in him by the salvage yard statute, have the discretion to refuse a properly tendered license renewal application of one who operates a salvage yard not adjacent to the highways of the State? This is the question for decision and it essentially turns on the construction of the meaning of words in a statute.

In order to ascertain the powers of the commissioner of highways pertaining to the operation of salvage yards, it is necessary to briefly survey the pertinent statutes involved.

The commissioner derives his general powers, duties and responsibilities from Chapter 17 of the Code. Section 8(1), Article 2A, Chapter 17 provides that the commissioner may "Exercise general supervision over the

state road program and the construction, reconstruction, repair and maintenance of state roads and highways; . . .", and Section 8 (23) of the same article allows the commissioner to "Invoke any appropriate legal or equitable remedies to enforce his orders, to compel compliance with requirements of law and to protect and preserve the state road and highway system or any part thereof; . . . ." Without surveying each and every subsection relating to the commissioner's duties, suffice it to say that his office is not granted any specific power in relation to the operation of salvage yards in the State of West Virginia.

Since 1959, however, the commissioner has been delegated specific responsibilities in regard to the regulation of salvage yards by virtue of Article 23, Chapter 17, Code, 1931, as amended. This is the statute by which the commissioner purports to exercise authority questioned in this proceeding. The provisions of the salvage yard statute relevant to this case are quoted or summarized as follows:

Section 1 of the statute sets forth a legislative declaration of intent and provides:

"The legislature hereby finds and declares that the establishment, operation, maintenance and use of salvage yards in areas adjacent to state roads, including federal-aid interstate and primary roads, is unsightly, visually offensive, depresses the value of the public investment in such roads, detracts from the safety and recreational value of travel thereon and destroys natural beauty, and therefore should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel thereupon, and to preserve natural beauty."

Section 2 (b) defines a salvage yard to mean:

"any place which is maintained, operated or used for the storing, keeping, buying, selling, or processing of salvage, or for the operation and maintenance of a motor vehicle graveyard, and

the term shall also include garbage dumps and sanitary fills."

Section 3 provides for an annual licensing provision for the operation of salvage yards as follows:

"No salvage yard . . . shall be . . . operated or maintained without a license. The commissioner shall have the sole authority to issue such a license . . . . All licenses issued under this section shall expire on the first day of January following the date of issuance. A license may be renewed from year to year upon paying the commissioner the sum of fifty dollars for each such renewal."

Section 4 provides in summary that where a salvage yard is located (1) within 1,000 feet of the nearest edge of the right of way of any road classified as a federal-aid interstate highway or any highway designated as part of the primary road system of the state, or (2) within 300 feet of the right of way of any state local service road, a license for operation may be issued or renewed only if the view of the salvage yard is effectively screened from the adjacent road by fencing. A state local service road is further defined by Section 2(d), Article 4, Chapter 17, Code, 1931, as amended, as "Localized arterial and spur roads which provide land access and socioeconomic benefits to abutting properties."

Section 4 also provides that one may continue to operate a salvage yard without screening by fences if the yard is not (1) within 1,000 feet of the right of way of any road classified as a federal-aid interstate highway or any highway designated part of the primary road system of the State, or (2) within 300 feet of the right of way of any state local service road.

Section 8 provides that whenever the operational salvage yard is located within the 1,000 or 300 foot set-back limitation defined in Section 4 and it cannot in the commissioner's opinion be effectively screened and the operator cannot lawfully comply with the provisions of this article and continue to operate, "then and only in such event" the commissioner can (1) relocate

the salvage yard with the consent of the operator, or (2) purchase or condemn the property rights of the operator and terminate all or part of the salvage business in question. This section further provides that if a salvage yard at any location is terminated under the provisions of Section 8 or by a court order as provided in Section 9 of the article, that the commissioner is thereafter inhibited from licensing the salvage yard at any location which is within the 1,000 or 300 foot set-back limitation of Section 4, unless and until the view of such yard from the highway is screened by fences as provided in the article.

Section 9 provides that the operation or maintenance of a salvage yard in violation of any provision of Article 23 is declared to be a public nuisance and gives the commissioner or the prosecuting attorney of the county in which such yard is located the right to apply to a court of competent jurisdiction for an injunction to abate the declared nuisance.

Section 10 provides the creation of a special fund to be comprised of license fee receipts, appropriations from the Legislature and federal funds distributed to this State in the implementation of the federal code provisions relating to salvage yards (23 U.S.C., Section 136).

Section 12 provides that the licensing provisions administered by the state tax department relating to the annual licensing of junk dealers and "stores" are inapplicable to salvage yards covered by the provisions of the article.

The above article giving the highway commissioner specific power and responsibility to regulate the operation of salvage yards became effective in its present form on July 1, 1967. It and a companion statute regulating outdoor advertising, Article 22, Chapter 17, Code, 1931, as amended, were passed to enable the State of West Virginia to participate in federal funds provided by Public Law, 89-285, 79 Stat. 1030 (October, 1965), popularly known as

the Federal Highway Beautification Act and now found in 23 U.S.C., Sections 136 and 131, respectively.

Section 136 of Title 23 of the United States Code provides that federal highway funds allocable to a state shall be reduced ten percent until such time as the state complies by statute and regulation with the control of junkyard or salvage yard operations as prescribed in the federal statute. The legislative intent of Congress in the passage of this act is relevant and closely parallels the statement of intent adopted by the West Virginia Legislature in the passage of Article 23 of Chapter 17

> "(a) The Congress hereby finds and declares that the establishment and use and maintenance of junkyards in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C., Section 136 (a).

A following subsection defines adjacent to the highway system as being "within one thousand feet of the nearest edge of the right-of-way and visible from the main traveled way of the [interstate or primary] system." 23 U.S.C., Section 136 (b).

Looking to the state and federal statutes on junkyards or salvage yards, where does the highway commissioner derive the authority to deny petitioner his license renewal? Administrative agencies are creatures of statute and delegates of the Legislature. "[T]heir power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim. They have no general or common-law powers but only such as have been conferred upon them by law expressly or by implication." 1 AM. JUR. 2d, *Administrative Law,* Section 70 (1962); See *Atlantic Greyhound Corporation v. Public Service Commission of West Virginia,* 132 W.Va. 650, 54 S.E.2d 169 (1949).

It is apparent that the highway commissioner derives no general statutory authority to regulate the operation of salvage yards from Section 8, Article 2A, Chapter 17, Code, 1931, as amended. His duties and responsibilities as set forth in that article relate directly to his supervision over the state road program with its normal incidents of construction, reconstruction, repair and maintenance.

If the commissioner has the power to refuse the granting of a license to operate a salvage yard business where the license fee has been properly tendered and the application properly made, he must find authority for his action in the expressed language of the salvage yard statute, Article 23, Chapter 17, Code, 1931, as amended, or in the powers that arise therein by implication. Though this Court, in order to define the intention of the Legislature in the passage of laws has often been compelled to refer to matters extrinsic of the statute itself, it is not necessary in this instance. Here, fortunately, the Legislature has provided reason and intent for the salvage yard statute in Section 1. It found that the operation of salvage yards in areas *adjacent to the State roads* to be unsightly and offensive, thereby depresses the value of the public investment in the highways, detracts from highway safety, diminishes the recreational value of travel and destroys natural beauty. Recognizing this, the Legislature determined to control salvage yards to protect public investment in highways, to promote safety and recreational value and to preserve natural beauty. A review of the Federal Highway Beautification Act, the section controlling junkyards, Title 23, U.S.C., Section 136, evidences a very similar intention on the part of Congress.

Beyond intent, the Legislature has clearly explained the *scope* of the commissioner's jurisdiction to regulate the operation of salvage yards. It said that the operation of such yards in areas adjacent to the State roads is the problem to be controlled by the enactment of the statute. Section 1, Article 23, Chapter 17, Code, 1931, as amended. Section 4 of the article fleshes out the meaning of

"adjacent to the highways" by providing that salvage yards located within a geographical proximity: (1) of 1,000 feet of the right of way of any road recognized as a federal interstate highway or any highway designated as a part of the primary road system of the state, or (2) within 300 feet of the right of way of any state local service road, shall be controlled by adequate fencing to screen the view of such yard from the highway, or shall be removed or relocated to accomplish the same end. This section also acknowledges that any salvage yard not located within the 1,000 or 300 foot set-back limitation may continue to be operated without fencing.

On the other hand, Section 2 (b) of the statute defines salvage yard to mean *any place* which is maintained or operated for this business, and Section 3 says that no salvage yard shall be operated without a license, and that the commissioner has the *sole* authority to issue such a license. The commissioner contends that the language of Sections 2 and 3 establish beyond doubt that his office, being the sole authority to issue salvage yard licenses, must thereby have the discretion to issue or not issue them as the commissioner determines. The petitioner concedes that the commissioner has discretion to grant or refuse a license renewal but contends that the commissioner has abused the discretion given him by the statute. For reasons to be set forth herein, we cannot agree with the parties that the commissioner has discretion to refuse the issuance of the license sought in this instance.

It is apparent that the commissioner is given discretion to make certain determinations and take certain actions under Sections 4 and 8 of the article when a salvage yard is located within 1,000 feet of an interstate or primary system highway, or within 300 feet of a state local service road. In those instances, the continued operation or the establishment of a salvage yard will be tolerated only when adequately fenced to remove it from the view of passers-by on the highways, and when it cannot be adequately fenced, such salvage yard must be removed or relocated away from the set-back lines established by the

statute. To aid the commissioner in the enforcement of the fencing and set-back provisions of the statute, Section 9 of the article, gives the commissioner resort to the courts of the county where the salvage yard is located to seek injunction and to have the operation of such yard declared a nuisance. If the salvage yard belonging to the petitioner Walter was located "adjacent to the highway" within the meaning of the statute, we would not question the commissioner's right or discretion to issue or refuse to issue the license if done within the confines of the statute.

But our problem is a broader one. Does the highway commissioner as a delegate of the Legislature have the right to regulate the operation of salvage yards anywhere in the State of West Virginia without regard to their proximity of location to the highways of this State?

Does the use of the words "sole authority to issue such a license" give the commissioner the unrestrained authority to issue or not issue the franchise to operate a business? This Court has recognized and previously upheld the Legislature's right to regulate through the highway commissioner the establishment, maintenance and operation of salvage yards adjacent to the highways of this State. *Farley v. Graney,* 146 W.Va. 22, 119 S.E.2d 833 (1960). In that opinion, Judge Calhoun, speaking for a majority of the Court said at page 48:

> "There can be no question of the right by legislation reasonably to regulate junk dealers. We can not say that the legislature was unjustified under its police power, based on considerations . . . including the set-back provisions and those relating to fences. No doubt the legislature took into consideration, among all other factors, an effort to promote public pride and public spirit, both on a statewide and local basis, and also a plan and purpose to promote efforts to attract to the state tourists and other travelers on our highways, with a view of promoting the economic well-being and the general welfare."

In the *Farley* case, the Court also recognized that the operation of a salvage yard business was a legitimate business enterprise. Accord: *Parkersburg Builders Material Company v. Barrack,* 118 W.Va. 608, 191 S.E. 368, 192 S.E. 291, 110 A.L.R. 1454 (1937). In the passage of the Federal Highway Beautification Act the United States Congress also recognized the importance and legitimacy of the salvage yard business. 2 U.S. CONG. & ADMIN. NEWS, 3712 (89 Cong.—First Session 1965).

Although an express grant of powers will be determined to include such other powers as are necessarily or reasonably incident to the powers granted, the powers should not be extended by implication beyond what may be necessary for their just and reasonable execution. 1 AM. JUR. 2d, *Administrative Law,* Sections 44 and 73 (1962); *C. C. T. Equipment Co. v. Hertz Corporation,* 256 N.C. 277, 123 S.E.2d 802 (1962). See also *Wilhite v. Public Service Commission,* 150 W.Va. 747, 149 S.E.2d 273 (1966). When a court is asked to find implied powers in a grant of legislative or executive authority it must assume that the lawmakers intended to place no greater restraint on the liberties of a citizen than was clearly and unmistakenly indicated by the language they used. *Ex parte Endo,* 323 U.S. 283, 89 L. Ed. 243, 65 S. Ct. 208 (1944).

To determine what the Legislature meant by "sole authority" and whether the commissioner is thereby given the discretion claimed in this proceeding, it is necessary to look at the plain meaning of the word "sole" and the circumstances surrounding its inclusion in the statute. BLACK'S LAW DICTIONARY, 1564 (4th ed. 1951), defines "sole" to mean "Single; individual; separate; the opposite of joint; . . . ." The dictionary approach to the plain meaning of the word "sole" would seem to indicate that simply the commissioner is the only person or single person to whom the authority is given to issue the license. See dissenting opinion, *Yates v. Mancari,* 153 W.Va. 350, 373, 168 S.E.2d 746 (1969). The context of the whole statute also supports this conclusion. According to 1 AM. JUR. 2d, *Administrative Law,* Section 48 (1962): "The

meaning of words in a statute which have no legal or technical signification must be ascertained from the connection in which they are used, the act in which they are found, and the legislation of which they form a part." Section 2 of the salvage yard statute regarding licensing should be read in *pari materia* with Section 10 of the article which creates a special fund derived from license receipts and other allocations, state and federal, to administer the purposes of the article. Section 12 of the article also clearly expresses the legislative intention that the tax commissioner shall not levy the store license or junk dealers' license fees to an operator of a salvage business and that, therefore, the highway commissioner is the person to do so under this article. Accord: 50 Ops. Att'y Gen. 320, 322 (1963) which opined the tax commissioner had no concurrent right to license salvage yard operations; only the road commissioner was given this right. Although an opinion of the attorney general is not binding upon this Court it is persuasive when it is issued rather contemporaneous with the adoption of the statute in question. See *State ex rel. Battle v. Baltimore and Ohio Railroad Company*, 149 W.Va. 810, 837, 838, 143 S.E.2d 331 (1965).

We hold therefore that the plain meaning of the word "sole" as used in Section 3, Article 23, Chapter 17, Code, 1931, as amended, is that the highway commissioner is the single person directed to issue licenses to salvage yard operators and use the receipts therefrom; that the commissioner is not thereby granted absolute discretion to issue or not issue licenses as he sees fit.

The authority of the highway commissioner to regulate the operation of salvage yards in geographical areas beyond the set-back lines established in Section 4, Article 23, Chapter 17, Code, 1931, as amended, is limited to the issuance and renewal of an annual license upon the tender of a properly executed application therefor, accompanied by the requisite annual licensing fee. The duty of the commissioner in this instance is so plain in point of law and so clear in matter of fact that no element of discretion

is left as to the precise mode of its performance; such duty is ministerial and a writ of mandamus is proper to compel its performance. *State ex rel. Judy v. Kiger,* 153 W.Va. 764, 172 S.E.2d 579 (1970).

We do not consider the question of the available remedies of private citizens regarding the operation of the salvage yard in their neighborhood, as that question is not properly before us. We simply say here that the commissioner cannot base his refusal to issue a license upon considerations other than the statute which gives him authority to act. To paraphrase the reasoning expressed by this Court in the case of *Beverly Grill, Inc. v. Crow,* 133 W.Va. 214, 57 S.E.2d 244 (1949), the operation of a salvage business not adjacent to the highways of this state when duly licensed is a lawful business made so by the common law and the statutes of this state. The right of a licensee to engage in this business cannot be nullified or ignored by official actions based on its unpopularity in the community in which it is located.

> "To permit such action would render possible the destruction of any or every lawful but locally unpopular business enterprise in any or every locality in the State . . . . Though the views and the sentiment of individual citizens or groups of citizens are always entitled to respect and serious consideration by public officials, they can not, until translated into law, influence or control the official conduct of public authorities in ignoring or disregarding the requirements of existing laws." *Beverly Grill, Inc. v. Crow, supra,* at 218.

We hold not that the commissioner has abused the discretion given him by statute but that he has refused to act where he has no discretion. Mandamus will lie to compel performance of a nondiscretionary duty of an administrative officer though another remedy exists, where it appears that the official, under misapprehension of law, refuses to recognize the nature and scope of his duty and proceeds on the belief that he has discretion to do or not to do the thing demanded of him. See *State ex*

*rel. The West Virginia Board of Education v. Miller,* 153 W.Va. 414, 168 S.E.2d 820 (1969). Accord: *Central Advertising Company v. Michigan State Highway Commission,* 12 Mich. App. 314, 162 N.W.2d 834 (1968), *affirmed* 383 Mich. 1, 172 N.W.2d 432 (1969) (highway commissioner prevented from assuming discretion not given him by Billboard Statute); *Markham Advertising Company, Inc. v. State,* 73 Wash.2d 405, 439 P.2d 248 (1968), *appeal dismissed,* 393 U.S. 316, 89 S. Ct. 553, 21 L. Ed. 2d 512 (1969) (testing constitutionality of a Billboard Statute).

The demurrer to the petition is overruled and the writ applied for is awarded.

*Writer awarded.*