447 S.E.2d 887

STATE of West Virginia ex rel. Darrell E. HOLMES, Clerk of the Senate of West Virginia, and Donald L. Kopp, Clerk of the House of Delegates of West Virginia, Relators,

v.

Glen B. GAINER III, Auditor of the State of West Virginia, Respondent,

and

The Honorable Herman Canady, Judge of the Circuit Court of Kanawha County, West Virginia, Respondent,

Donna J. Boley and Robert P. Pulliam, M.D., Intervenors.

No. 22226.

Supreme Court of Appeals of West Virginia.

Submitted June 7, 1994.

Decided July 20, 1994.

Joseph R. Goodwin, Debra C. Price, Goodwin & Goodwin, Charleston, for relators.

Silas B. Taylor, Sr. Deputy Atty. Gen., Charleston, for respondent.

James B. Lees, Jr., Hunt, Lees, Farrell & Kessler, Charleston, for intervenors.

MILLER, Justice:

The relators, Darrell E. Holmes, Clerk of the Senate of West Virginia, and Donald L. Kopp, Clerk of the House of Delegates of West Virginia, on April 5, 1994, filed this original petition for a writ of mandamus against the respondent, Glen B. Gainer III, Auditor of the State of West Virginia, and for a writ of prohibition against the respondent, the Honorable Herman Canady, Judge of the Circuit Court of Kanawha County. Subsequently, we permitted Donna J. Boley and Robert P. Pulliam, M.D., to appear as intervenors and gave them the right to take depositions and to file interrogatories. This matter was set for a full hearing on June 7, 1994.

The relators seek a writ of mandamus to compel the State Auditor to perform his statutory duty to issue warrants for the payment of salaries and expenses for the members of the Legislature and others pursuant to House Bill 4031 (Bill). This Bill was passed by the West Virginia Legislature during the 1994 session. The State Auditor is authorized to issue warrants for the payment of legislative compensation and expense allowances pursuant to W.Va.Code, 12–3–1 (1990), and W.Va.Code, 12–3–5 (1923). At issue is the validity of the legislative pay raise contained in the Bill. The Auditor contends that the procedures used in adopting the Bill did not conform to the requirements of Section 33 of Article VI of the West Virginia Constitution relating to pay raises for members of the West Virginia Legislature.

The relators also sought a writ of prohibition ordering Judge Canady to refrain from hearing a declaratory judgment action currently pending in the circuit court which basically involves the same matters at issue in this case. In the alternative, they asked that the circuit court proceeding be stayed pending resolution of this petition.[1]

Section 33 of Article VI of the West Virginia Constitution established a Citizens Legislative Compensation Commission (Commission) and vested the Commission with the authority to submit to the West Virginia Legislature its resolution determining com-

---

1. On March 23, 1994, Senator Donna J. Boley and Delegate Robert P. Pulliam, M.D., filed a declaratory judgment action in the Circuit Court of Kanawha County against the Honorable Larrie Bailey, Treasurer of the State of West Virginia (Civil Action No. 94–C–529). In the declaratory judgment action, the plaintiffs requested that the circuit court declare W.Va.Code, 4–2A–1, et seq., as amended by the Bill, unconstitutional or void as to the legislative pay raises. By letter dated April 4, 1994, the State Auditor informed the relators that he would refuse to issue warrants for payments to be made pursuant to the Bill, pending a final judicial determination of the constitutionality of the legislative pay raises. Judge Canady voluntarily stayed proceedings in his court pending resolution of the issues by this Court.

pensation and expense allowances for members of the Legislature.[2] On March 3, 1994, the Commission endorsed a "Resolution Submitting Recommendations with Respect to Compensation and Expense Allowances." The resolution was submitted to the West Virginia Legislature at its regular session on March 3, 1994, the same date it was adopted by the Commission.

After submission of the resolution to the Legislature, it was enacted into the Bill, which amended W.Va.Code, 4–2A–1, *et seq.*, to increase the compensation and expense allowances of the legislators. The Bill also increased the salaries of other State officials and the judiciary.[3] On March 19, 1994, the Honorable Gaston Caperton, Governor of the State of West Virginia, signed the Bill into law.

The issues before this Court are simply (1) whether the requirements for setting legislative compensation and expense allowances under Section 33 of Article VI of our Constitution were followed properly, and (2) whether contact by members of the Legislature with members of the Commission violated due process such that the increased compensation and expense allowances for the Legislature should be held invalid.

I.

We first address the question of the constitutionality of the Commission's resolution that resulted from its meeting on March 3, 1994. A review of the history of Section 33 of Article VI of the West Virginia Constitution is of some value to gain insight into the adoption of this 1970 amendment. Prior to

---

**2.** Section 33 of Article VI of the West Virginia Constitution provides:

"Members of the legislature shall receive such compensation in connection with the performance of their respective duties as members of the legislature and such allowances for travel and other expenses in connection therewith as shall be (1) established in a resolution submitted to the legislature by the citizens legislative compensation commission hereinafter created, and (2) thereafter enacted into general law by the legislature at a regular session thereof, subject to such requirements and conditions as shall be prescribed in such general law. The legislature may in any such general law reduce but shall not increase any item of compensation or expense allowance established in such resolution. All voting on the floor of both houses on the question of passage of any such general law shall be by yeas and nays to be entered on the journals.

"The citizens legislative compensation commission is hereby created. It shall be composed of seven members who have been residents of this State for at least ten years prior to the date of appointment, to be appointed by the governor within twenty days after ratification of this amendment, no more than four of whom shall be members of the same political party. The members shall be broadly representative of the public at large. Members of the legislature and officers and employees of the State or of any county, municipality or other governmental unit of the State shall not be eligible for appointment to or to serve as members of the commission. Each member of the commission shall serve for a term of seven years, except of the members first appointed, one member shall be appointed for a term of one year, and one each for terms ending two, three, four, five, six and seven years after the

date of appointment. As the term of each member first appointed expires, a successor shall be appointed for a seven-year term. Any member may be reappointed for any number of terms, and any vacancy shall be filled by the governor for the unexpired term. Any member of the commission may be removed by the governor prior to the expiration of such member's term for official misconduct, incompetency or neglect of duty. The governor shall designate one member of the commission as chairman. The members of the commission shall serve without compensation, but shall be entitled to be reimbursed for all reasonable and necessary expenses actually incurred in the performance of their duties as such members.

"The commission shall meet as often as may be necessary and shall within fifteen days after the beginning of the regular session of the legislature in the year one thousand nine hundred seventy-one and within fifteen days after the beginning of the regular session in each fourth year thereafter submit by resolution to the legislature its determination of compensation and expense allowances, which resolution must be concurred in by at least four members of the commission.

"Notwithstanding any other provision of this Constitution, such compensation and expense allowances as may be provided for by any such general law shall be paid on and after the effective date of such general law. Until the first such general law becomes effective, the provisions of this section in effect immediately prior to the ratification of this amendment shall continue to govern."

**3.** The relators make no challenge in this proceeding to the pay raises granted to other State officials and to the judiciary.

the adoption of Section 33 of Article VI in its current form, which was ratified by the voters on November 3, 1970, passage of a separate constitutional amendment was required to increase the compensation and expense allowances of members of the Legislature.[4] This constitutional requirement made it extremely difficult to get a legislative compensation constitutional amendment to increase legislative salaries passed with any frequency by the voters. This difficulty, undoubtedly, was the chief impetus behind the 1970 amendment which was designed to liberalize the ability to increase legislative compensation and expense allowances. Many states have more liberal procedures that allow the members of their legislatures to increase their pay without voter approval at any time. In some states, the raise does not take effect in the session in which it was voted,[5] while in other states, the raise does not take effect during the term of the legislators voting on it.[6]

The relators argue that the resolution on compensation and expense allowances submitted by the Commission and reduced to the Bill complies with the mandate of Section 33 of Article VI. They point to the ten words at the beginning of the third paragraph of Section 33: "The commission shall meet as often as may be necessary[.]" They claim that this language provides that the Commission can meet as many times as desired and also can offer a resolution on compensation and expense allowances each time. Consequently, the relators contend that the Legislature can reduce the resolution to a Bill any time after the resolution is submitted.

On the other hand, the intervenors argue that the relators' interpretation of Section 33 of Article VI of the West Virginia Constitution completely ignores the remaining language of the third paragraph relating to submission of a resolution on compensation and expense allowances by the Commission to the Legislature every four years.[7] They contend that under this language, the Commission can submit a resolution on compensation and expense allowances only once every four years based on a quadrennial cycle starting with the 1971 regular legislative session. They also state that such submission must be made within fifteen days after the beginning of the regular session, which was not done in this case.

We have not had occasion to interpret this provision. There are two Attorney General opinions that have touched on this question. The first opinion was issued on March 1, 1977, by the Honorable Chauncey H. Browning, Jr., Attorney General, to William C. Campbell, the Chairman of the Commission. Mr. Campbell had inquired whether the

---

4. For example, Section 33 of Article VI, contained in the 1931 Revised Code, set these salaries:

> "The members of the Legislature shall each receive for their services the sum of five hundred dollars per annum and ten cents for each mile traveled in going to and returning from the seat of government by the most direct route. The Speaker of the House of Delegates and the President of the Senate, shall each receive an additional compensation of two dollars per day for each day they shall act as presiding officers."

The editor's notes to the current provision trace the history of the various amendments to Section 33 of Article VI. These notes indicate that prior to 1970 the members of the Legislature only had two raises. The first raise came from an amendment ratified by the voters in November, 1920, which increased their salaries from four dollars a day to five hundred dollars per annum. The second amendment ratified in November, 1954, increased their salaries to fifteen hundred dollars per annum.

5. See Ky. Const. § 42 (1979); Miss. Const. Art. 4, § 46 (1972); Mo. Const. Art. 3, § 16 (1970); N.C. Const. Art. 2, § 16 (1970).

6. See Ga. Const. Art. 3, § 4, ¶ 6 (1983); Ill. Const. Art. 4, § 11 (1970); Me. Const. Art. 4, Pt. 3, § 7 (1983); N.Y. Const. Art. 3, § 6 (1964); Ohio Const. Art. 2, § 31 (1979).

7. The third paragraph of Section 33 of Article VI states:

> "The commission shall meet as often as may be necessary and shall within fifteen days after the beginning of the regular session of the legislature in the year one thousand nine hundred seventy-one and within fifteen days after the beginning of the regular session in each fourth year thereafter submit by resolution to the legislature its determination of compensation and expense allowances, which resolution must be concurred in by at least four members of the commission."

For the entire text of Section 33 of Article VI, see note 2, supra.

Commission could send its resolution on compensation and expense allowances to the Legislature at intervals of less than four years. Attorney General Browning, after quoting the third paragraph of Section 33 of Article VI, concluded that a resolution must be submitted at least every four years, but one could be submitted more often. *See* 57 Atty.Gen.Op. 115 (March 1, 1977).[8] Much the same reasoning was used by the Honorable Darrell V. McGraw, Jr., Attorney General, in his opinion dated March 9, 1994, addressed to the Honorable Keith Burdette, President of the Senate.

We recognized in *Walter v. Ritchie*, 156 W.Va. 98, 109, 191 S.E.2d 275, 282 (1972), that: "Although an opinion of the attorney general is not binding upon this Court it is persuasive when it is issued rather contemporaneous with the adoption of the statute in question. *See State ex rel. Battle v. Baltimore and Ohio Railroad Company*, 149 W.Va. 810, 837, 838, 143 S.E.2d 331[, 347, 348] (1965)." However, in this case, we believe the Attorney General opinions failed to take into account the historical background surrounding the adoption of Section 33 of Article VI.

■ We also find there is an ambiguity in the third paragraph of Section 33. This ambiguity in the third paragraph arises because there is no mandatory language clearly stating that the Commission's resolution on compensation and expense allowances can be submitted only once every four years. Moreover, it is difficult to imply such a meaning as it would tend to negate the language that allows the Commission to meet as often as possible. When an ambiguity occurs, we apply the rule set out in Syllabus Point 1 of *Winkler v. State School Building Authority*, 189 W.Va. 748, 434 S.E.2d 420 (1993):

"Questions of constitutional construction are in the main governed by the same general rules applied in statutory construction."

*See also State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973).

■ It was this ambiguity which caused the two Attorney General opinions to hold that the Commission could submit a resolution more often than every four years. However, such an interpretation allowing the Commission to meet more frequently than every four years does not necessarily imply that it can submit a resolution at any time after it meets. This type of construction would emasculate the language in the latter portion of the third paragraph which sets out the four-year cycle beginning after the 1971 regular session of the Legislature, which would be contrary to our normal rule requiring us to consider all parts of a constitutional or statutory provision. As we set out in Syllabus Point 3 of *Jeffrey v. Jeffrey*, 188 W.Va. 476, 425 S.E.2d 152 (1992):

"'"In ascertaining legislative intent, effect must be given to each part of the statute and the statute as a whole so as to accomplish the general purpose of the legislation." Syl. Pt. 2, *Smith v. State Workmen's Compensation Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syl. Pt. 3, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984)."

It is our view that this ambiguity can best be resolved by holding that what was intended was to allow the Commission to have considerable latitude in the frequency of its meetings. However, its resolution on compensation and expense allowances must be submitted to the Legislature at sessions occurring at four-year cycles calculated from the 1971 regular session of the Legislature. Such an interpretation gives meaning to both

---

8. The conclusion of Attorney General Browning's opinion states as follows:

"The interpretation of the above constitutional section which most readily presents itself is that the Commission must submit by resolution 'to the legislature its determination of compensation and expense allowances' every four years, which is mandatory. However, it is the opinion of this office that the provision in no way restricts the Commission in present-

ing such a resolution more often than every four years after the year 1971. Otherwise, there would be no need for the above provision requiring the Commission to meet as often as may be necessary. What purpose would be served for the Commission to have meetings 'as often as may be necessary,' when it could take no action in accordance with the constitutional provision?" 57 Atty.Gen.Op. at 116.

parts of the third paragraph of Section 33. Moreover, it comports with the historical analysis of the reasoning behind Section 33 of Article VI, which was designed to loosen the extremely restrictive constitutional limitation that precluded any increase in legislative compensation and expense allowances unless it was voted on by the citizens.

From an historical standpoint, we do not believe that the Legislature in 1970, when it adopted the amendment of Section 33 of Article VI creating the Commission, which was ratified by the voters, contemplated that it would receive a resolution for compensation and expense allowances from the Commission more often than every four years. Nor do we believe that, in view of past history, the voters who approved the amendment thought otherwise.

We also conclude that Section 33 of Article VI, which allows the Commission to meet as often as necessary, is designed to give the Commission ample opportunity to examine legislation from other states and determine what would be a reasonable increase in legislative compensation and expense allowances. Moreover, because the Commission's resolution must be submitted within fifteen days after the beginning of the legislative session, the Commission needs the opportunity to meet as often as necessary in advance of the legislative session to permit input from interested citizens.

■ Consequently, we hold that Section 33 of Article VI allows the Commission to meet as often as necessary. However, Section 33 restricts the Commission from submitting to the Legislature its resolution on compensation and expense allowances except on a quadrennial basis calculated from the 1971 legislative session. There is nothing in this section that requires the Legislature to act on the resolution at the legislative session when it is first submitted. Once the Commission's resolution is properly submitted, the Legislature may act on it at any time during the four-year cycle before the next resolution is required to be submitted.

■ Although we conclude that the Commission and the Legislature failed to follow the provisions of Section 33 of Article VI, as we now construe them, we decline to strike the increase in legislative compensation and expense allowances. As we have indicated, there has been no authoritative interpretation of Section 33 of Article VI before this case. Indeed, as we earlier observed, the two Attorney General opinions would point to an interpretation that would justify the actions taken by the Commission and the Legislature.

■ In *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), we discussed at some length the question of what effect our judicial opinion should have as to a pending case and to past events under what is termed the concept of retroactivity. In *Bradley*, we made this general summary in Syllabus Point 5:

"In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions."

*See also* Syllabus Point 2, *Devrnja v. West Virginia Bd. of Medicine,* 185 W.Va. 594, 408 S.E.2d 346 (1991); *Geibel v. Clark,* 185 W.Va.

505, 510, 408 S.E.2d 84, 89 (1991); Syllabus Point 2, *Ashland Oil, Inc. v. Rose*, 177 W.Va. 20, 350 S.E.2d 531 (1986); *Daily Gazette Co., Inc. v. Committee on Legal Ethics*, 176 W.Va. 550, 551–52, 346 S.E.2d 341, 342–43 (1985); *Bond v. City of Huntington*, 166 W.Va. 581, 600, 276 S.E.2d 539, 549 (1981); Syllabus Point 3, *Ables v. Mooney*, 164 W.Va. 19, 264 S.E.2d 424 (1979).

More recently in *Winkler, supra*, we considered the retroactivity of an opinion in which we held that a proposed issuance of bonds to finance school improvements was unconstitutional because it violated the debt restriction provision contained in Section 4 of Article X of the West Virginia Constitution. We refused to invalidate similar bonds that were issued prior to the date of the opinion, as summarized in Syllabus Point 9 of *Winkler*: "Based upon our general principles of retroactivity of judicial decisions, revenue bonds issued by the State of West Virginia School Building Authority pursuant to W.Va. Code, 18–9D–1, *et seq.*, prior to the date of this opinion are not invalid."

As we noted in Syllabus Point 5 of *Bradley, supra*, we generally will make an opinion prospective only where "substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent." Here, although there is no judicial precedent construing Section 33 of Article VI, there are two opinions from two different Attorney Generals indicating that the resolution on compensation and expense allowances could be filed and acted upon within the four-year cycle. Certainly, the questions in this case involve a substantial public issue as they challenge the entire procedure for obtaining increases in legislative compensation and expense allowances. These are matters in which the public, as taxpayers, have a vital interest. Consequently, we hold that based upon our general principles of retroactivity of judicial opinions, the legislative compensation and expense allowances contained in the Bill are not invalid. Thus, under *Bradley, supra*, we give only prospective operation to this opinion. However, in the future, both the Commission and the Legislature will be bound by the dictates of this opinion.

## II.

A subsidiary attack is made on the Bill because the Commission failed to file its resolution within fifteen days from the opening of the legislative session, as required by Section 33 of Article VI. This late filing was occasioned by the fact that there were four vacancies on the seven-member Commission before the beginning of the 1994 legislative session. These vacancies were not filled by the Governor until February 7 and 11, 1994, after the Legislature was in session. These appointments were made after the fifteen-day deadline for filing the Commission's resolution.

We are not cited nor have we found a case that discusses what effect a governor's failure to appoint members of an administrative agency will have on the agency's ability to meet a statutory or constitutional deadline. However, in the past, we have attempted to solve situations that arise because of the lack of executive appointments to an administrative agency by fashioning some reasonable relief. It is apparent that an executive official could through a statutory appointment authority virtually paralyze the operation of an administrative agency by failing to exercise this power of appointment. Thus, in *State ex rel. Brotherton v. Moore*, 159 W.Va. 934, 230 S.E.2d 638 (1976), we held that a writ of mandamus would lie to compel the Governor to exercise his power of appointment.[9]

In *Serian v. State By and Through West Virginia Board of Optometry*, 171 W.Va. 114, 297 S.E.2d 889 (1982), we held that the Governor's failure to appoint a lay member to the Board of Optometry, as required by statute, would not deprive the Board of its jurisdiction to hear a license revocation case. More recently in *Francis O. Day Co. v. West Virginia Reclamation Board of Review*, 188

---

9. Syllabus Point 3 of *State ex rel. Brotherton v. Moore, supra*, states: "Mandamus lies to compel the governor to exercise his power of appointment under Section 9 of Article VI of the Constitution of West Virginia when the governor declines or fails to exercise his power for an unreasonable period of time."

W.Va. 418, 424 S.E.2d 763 (1992), the Board of Review lacked the four votes required by statute from a seven-member board because of the absence of a member. The Board split three to three, and it then took no action on the administrative appeal because there were not the statutory four votes. We held that the Board must enter an order allowing an appeal to the next higher tribunal rather than delay the entire administrative decision.[10]

█ These cases demonstrate this Court's concern that an administrative agency or a commission should not be crippled by actions that are entirely beyond its control, which would destroy the reasonable expectations of the parties who are the beneficiaries of its jurisdiction. Consequently, we conclude that the late filing by the Commission of its resolution beyond the fifteen-day period set in Section 33 of Article VI of the Constitution will not defeat the resolution where it was occasioned by the lack of a quorum by reason of executive delay in making the appointments.

### III.

█ Finally, we address the intervenors' due process claims which are predicated on the fact that some members of the Legislature contacted members of the Commission regarding their views as to the amount of legislative compensation and expense allowances that the Commission should recommend. This issue was not raised by the respondent Auditor Gainer. The intervenors cited no law to support this issue in their brief filed on June 3, 1994, four days before the scheduled final arguments. During the course of oral arguments, the intervenors

cited two cases—*Home Box Office, Inc. v. Federal Communications Commission*, 567 F.2d 9 (D.C.Cir.1977), and *Portland Audubon Society v. The Endangered Species Committee*, 984 F.2d 1534 (9th Cir.1993). *Portland Audubon* involves provisions of the Federal Administrative Procedure Act, which specifically ban *ex parte* communications under 5 U.S.C. § 557(d)(1) and (2) (1976). We, of course, are not controlled by the Federal Administrative Procedures Act nor does our Administrative Procedures Act, W.Va.Code, 29A–1–1, *et seq.*, contain similar language.[11] The issue in *Home Box Office* involved federal rulemaking by the Federal Communications Commission where there appears to be some restriction on *ex parte* communications under 5 U.S.C. § 553(c) (1966).

Whatever due process force *Home Box Office, supra,* may be said to have outside the restrictions contained in the Federal Administrative Procedures Act was not recognized by the same court in its later opinion in *Sierra Club v. Costle*, 657 F.2d 298 (D.C.Cir. 1981).[12] In *Sierra Club*, the court, after footnoting a variety of commentators' views regarding *ex parte* communications involving informal rulemaking of a policymaking sort, came to this conclusion:

> "Under our system of government, the very legitimacy of general policymaking performed by unelected administrators depends in no small part upon the openness, accessibility, and amenability of these officials to the needs and ideas of the public from whom their ultimate authority derives, and upon whom their commands must fall. As judges we are insulated from these pressures because of the nature

---

**10.** Syllabus Point 2 of *Francis O. Day Co., supra,* states:

> "When an administrative agency or board is unable to act because it lacks a statutory quorum or is unable to muster enough votes to meet a statutory requirement of a minimum number of votes necessary for a decision, the agency or board must enter an order allowing the litigants in the case before it to proceed to the next higher—judicial or administrative—tribunal."

**11.** In making this observation, it should not be inferred that we find the Commission to be under our Administrative Procedures Act.

**12.** In *Sierra Club*, 657 F.2d at 402, this statement is made:

> "Lacking a statutory basis for its position, [Environmental Defense Fund] would have us extend our decision in *Home Box Office, Inc. v. FCC* to cover all meetings with individuals outside EPA during the post-comment period. Later decisions of this court, however, have declined to apply *Home Box Office* to informal rulemaking of the general policymaking sort involved here[.]" (Footnotes omitted).

of the judicial process in which we participate; but we must refrain from the easy temptation to look askance at all face-to-face lobbying efforts, regardless of the forum in which they occur, merely because we see them as inappropriate in the judicial context. Furthermore, the importance to effective regulation of continuing contact with a regulated industry, other affected groups, and the public cannot be underestimated. Informal contacts may enable the agency to win needed support for its program, reduce future enforcement requirements by helping those regulated to anticipate and shape their plans for the future, and spur the provision of information which the agency needs." 657 F.2d at 400–01. (Footnotes omitted).

In this case, we view the Commission, at best, as a limited administrative agency empowered to act on the very narrow issue of legislative compensation and expense allowances. Its resolution may be considered as policymaking of a sort, but we agree with the foregoing statement from *Sierra Club* and its conclusion that it would not impose a judicial prohibition fashioned under a due process rubric on *ex parte* communications to informal administrative proceedings. Based on the above, we find no merit in the intervenors' due process argument.

### IV.

In conclusion and for the reasons stated in this opinion, we issue a writ of mandamus directing Auditor Gainer to process the legislative compensation and expense allowances in accordance with the terms contained in the Bill. Moreover, we issue a writ of prohibition against Judge Canady directing that he proceed no further with the declaratory judgment action involving the issues resolved by this opinion.

Writs granted.

NEELY, Justice, dissenting in part:

I dissent to the court's holding that *W.Va. Const.* Art. VI, § 33 prohibits the commission from submitting a proposal for a pay increase other than once every four years. The majority uses phrases such as "[i]t is our view" and "we do not believe"; however, our "view"

and our "belief" have nothing to do with the matter. The plain wording of *W.Va. Const.* Art. VI, § 33 permits the commission *"to meet as often as may be necessary* and *shall* within fifteen days after the beginning of the regular session of the legislature in the year one thousand nine hundred seventy-one and within fifteen days after the beginning of the regular session in each fourth year thereafter submit by resolution to the legislature its determination of compensation and expense allowances, which resolution must be concurred in by at least four members of the commission."

The plain words of § 33 allows the commission to meet as often as it wishes, but it *must* submit a resolution every four years. There is nothing contradictory or ambiguous in these provisions, since as the facts of this case demonstrate, governors may be surpassingly reluctant to appoint commissions disposed to adjust legislative pay in an equitable way.

At the heart of this case is a loathing of all politicians in general and a peculiar distaste for legislators in particular. I take time to dissent in part because I believe that someone should point out that the Legislature are the heros and not the villains of the democratic process.

It was in the Legislature, over twenty-two years ago, that I held my first elective office, and those years were a far greater education than I had ever received at Dartmouth College or Yale Law School. I remember that the senators and delegates with whom I served during those years were among the highest quality people with whom I was ever associated—then or now—and the process of striking the right balance among competing interests was, perhaps, the greatest challenge and most compelling experience of my life.

But the problems that confronted us in those halcyon days of economic boom and federal revenue sharing were as child's play compared to the problems that confront our Legislature today. Thus, it is the Legislature—not this court, not the governor, and not the host of indifferent, merit-selection, colorless, odorless and tasteless, coffee-suck-

ing bureaucrats—who must undertake the demanding and unenviable task of rescuing a suffering West Virginia from the succession of tragedies and reversals that have daunted our progress for the last fourteen years.

The reason that all legislators are unpopular and thought deserving of economic penalties is that the legislature is the great crucible of democracy—a monument to humane and gentle government, characterized by accommodation and measured straining in opposite directions. Had I not served in the House of Delegates, I would never have understood the full dimensions of the Founding Fathers' towering vision, nor would I have appreciated the complaints that the leaders in recently freed Eastern European countries have voiced that their societies hang in the balance simply because of their own lack of experience in democratic institutions.

Although the legislature is regularly taken for granted here, it is interesting to reflect what a contribution to the peace, order and prosperity of the world would attend the peppering of Eastern Europe with just two hundred alumni and alumnae of either house of the West Virginia Legislature. How much would a citizens' compensation commission in Ukraine, Hungary, or Belarus pay our legislators to sort things out in a peaceful way that would save thousands of lives and billions of dollars in property?

The reason for the Legislature's generally low esteem is that *any* legislature worth its salt is essentially in the business of allocating scarce resources among competing ends. Regretfully, a legislature is seldom called upon to decide between right and wrong; rather, legislatures are called upon to decide between right and right, and that always leaves everyone who doesn't get everything he or she wants dissatisfied. Perennial legislative fights involve rich *versus* poor, developer *versus* environmentalist, capital *versus* labor, minorities *versus* majorities, women *versus* men, pro-choice advocates *versus* right-to-life advocates, industry *versus* agriculture, recipients of social services *versus* taxpayers, parents and children *versus* teachers and school boards, landlords *versus* tenants, and creditors *versus* debtors.

There are some legislators who are lazy, incompetent and generally despicable, just as there are such judges, plumbers, doctors, garage mechanics, and internal revenue agents. But the great majority of legislators work far beyond the hours demanded by the sixty day regular session. Part-time legislators must work as hard to get elected as officeholders who win full time jobs, and many legislators work as hard at being legislators as those holding full time jobs when all the hours of constituent telephone calls, town meetings, reading and answering correspondence, and campaigning (which essentially involves the useful work of meeting constituents and listening to their concerns) are taken into account.

All this returns me, then, to an analysis of what was behind the wording of *W.Va. Const.* Art. VI, § 33. Given the pervasive hostility to legislators, it was thought necessary to *require* the commission to meet *at least* once every four years and to issue a report. However, to the extent the commission was disposed to do so, it could meet more frequently and report as often as it wished.

Now all of this makes perfectly good sense if we realize that the Legislature has *not* raised its pay every four years or even come close. This is only the third pay raise the legislature has afforded itself since 1971! In years when money is tight for teachers, public employees, judges, and the state police, the Legislature can hardly give itself a raise even if such a year falls upon the majority's magic fourth year. Occasionally it is politically possible to include the Legislature in a general raise, as occurred in 1994, and when that happens the Legislature should—like every other public employee, teacher, judge, and cop—have the benefit of having their salaries based on the fair value of their services in the year the raise is passed.

BROTHERTON, Chief Justice, Dissenting:

I dissent to the majority opinion.

I concede that this is a masterfully drafted opinion, because only an opinion which has been so carefully crafted could lull the reader into believing that it is proper to hold that a constitutional provision means one thing to-

day, but another tomorrow. In upholding House Bill 4031, the majority uses enough smoke and mirrors to put the modern-day illusionist David Copperfield to shame. Just as Copperfield made the Statue of Liberty disappear and later reappear, so the majority makes the Constitution disappear in 1994 and reappear in 1995.

The majority upholds the validity of House Bill 4031 on the flimsy basis of two Attorney General opinions, the failure of the Governor of this State to perform a discretionary duty, and the doctrine of retroactivity.

Quite frankly, I have never known this Court to use the opinion of an Attorney General as a crutch to declare an act of the Legislature valid.[1] In fact, the majority cited two cases as standing for the proposition that opinions of the Attorney General are merely persuasive, not binding. The majority then concluded: "However, in this case we believe the Attorney General opinions failed to take into account the historical background surrounding the adoption of § 33 of Article VI." Therefore, the majority implies that these opinions were wrong. Yet, these opinions are considered justification for holding House Bill 4031 valid.

The majority correctly states that the Attorney General opinions are incorrect. However, they essentially conclude that because they believe Article VI, § 33 to be ambiguous, the Legislature should not be penalized for relying on what the majority determined to be the incorrect interpretation.[2] I disagree. Just because the Attorney Generals couldn't read and understand the plain meaning of the section doesn't mean that the section is ambiguous. The majority even admits that in the future the Commission's recommendation must be submitted in the first fifteen days of a regular session in four-year cycles which began in 1971. Yet, this resolution was submitted long after the first fifteen days of the 1994 regular session and

not in the fourth year of the cycle. It is clearly the "obvious" interpretation of § 33—and the majority opinion so holds for the future—that compensation resolutions can only be submitted in four-year cycles which began in 1971. However, the majority dances around the maypole and declares the obvious ambiguous.

The second illusion used in the majority opinion concerns the Governor's failure to perform his duty to appoint a sufficient number of citizens to the Commission to create a quorum in order that the Commission could meet. Is that a valid reason to declare an unconstitutional act of the Legislature valid? As a matter of fact, the Governor cannot be faulted for reading Article VI, § 33 of the Constitution (as the majority interprets it beginning in 1995) as stating that a resolution must be submitted within the first fifteen days of a regular legislative session in the fourth year, calculated from 1971. That being true, when he was pressured by the Legislature—not by citizens, but by the Legislature—to fill the vacancies on the Commission with their recommendations, he certainly had a right to believe that the fifteen-day period had passed and that 1994 was not the fourth year, as calculated from the 1971 regular session. The majority admits, in discussing the Governor's failure to fill the vacancies on the Commission, that they cannot find any case law that would govern the effect of the Governor's failure to appoint members to the Commission. To put part of the blame for the passage of House Bill 4031 on the Governor is simply unconscionable.

One of the fallacies in the majority's reasoning is that they treat the Citizens Legislative Compensation Commission as an administrative agency in theory, if not in actual fact. It is not. It is a constitutional commission created by the citizens of the State when they approved the constitutional amendment in Article VI, § 33. The majority cites a number of cases, such as *State ex rel. Broth-*

1. It is noteworthy to point out that the majority never finds that House Bill 4031 is constitutional, but simply holds it to be valid.

2. The majority found that allowing a compensation resolution to be submitted more often than every four years would emasculate the language in the latter portion of the third paragraph,

which sets out the four-year cycle beginning after the 1971 regular session of the Legislature. Further, they felt that such an interpretation would be contrary to the Court's normal rule of interpretation requiring the Court to consider all parts of a constitutional or statutory provision.

*erton v. Moore,* 159 W.Va. 934, 230 S.E.2d 638 (1976) and *Serian v. State by and through the West Virginia Board of Optometry,* 171 W.Va. 114, 297 S.E.2d 889 (1982), for the proposition that failure of the executive to appoint people to statutory boards paralyzes the operation of administrative agencies. Those cases involved administrative agencies performing necessary functions in order for the agency to operate properly. That is not true in this case. Regardless of whether the Commission ever met, the Legislature could still operate. The compensation and expenses the legislators receive as a result of the Commission's recommendations have nothing to do with the general operation of the legislative branch of government.

I also find that applying the principle of retroactivity is unnecessary in this case. According to Article VI, § 33, and the majority opinion, the year 1995 will be the proper year in which a compensation resolution should be submitted to the Legislature. Rather than tortuously attempt to hold House Bill 4031 valid, the majority should have held House Bill 4031 unconstitutional and pointed out that, in accordance with their opinion as to the proper interpretation of Article VI, § 33, a similar resolution could properly be submitted in the first fifteen days of the regular session in January, 1995. That simple solution does not require this Court to manipulate precedent to stand as authority for their decision to make improper actions valid.

That being said, I also dissent because the petitioners, intervenors, and the majority miss the heart of the issue: The deprivation of the citizens' rights through the abuse of legislative power.[3] This has become all too prevalent in this day and age.

As the majority points out, prior to the adoption of Article VI, § 33 of the West Virginia Constitution, as amended in 1970, the Legislature had to go to the citizens of this State with a constitutional amendment requesting a pay raise. To have even a hope of obtaining approval of such a request, the Legislature had to include additional duties in order to justify the increased compensation. In the general election of 1970, the citizens were persuaded to give up their constitutional right to control the compensation of legislators by delegating that power to a Citizens Legislative Compensation Commission, which is a constitutional citizens commission, not a government or statutory commission. For the first time, this amendment allowed the Citizens Commission to set compensation, allowances, and expenses. The citizens did not relinquish this power lightly.

In reading the amendment, you realize, as the legislature did in 1970, that in order to approve the amendment, the citizens had to be assured that the Legislature would have nothing to do with setting their own compensation. That was accomplished by the following provisions of § 33: (1) The Commission shall be composed of seven members who have been residents of this State for at least ten years prior to the date of appointment; (2) members are to be appointed by the Governor of this State without the need of confirmation of the Senate; (3) the members shall be broadly representative of the public at large; and (4) *members of the Legislature and officers and employees of the State or of any county, municipality, or other governmental unit of the State shall not be eligible for appointment to or serve as a member of the Commission.* How much clearer can it be? The Legislature should have no control over the determination of their own compensation, allowances, or expenses.

But did that happen in the passage of House Bill 4031? Clearly not. In the closing weeks of the 1994 regular session of the Legislature, the Governor was coerced by legislators—not citizens, legislators—into making appointments to the Commission of people recommended by the legislators. Why do I say coerced? Because the Governor's legislative program was stalled in the Legislature, and if he was to get any of his programs passed, the demand was to fill the vacancies on the Commission with legislative recommendations. The President of the West Virginia Senate, not a member of the Commission with whom the power to call meetings was vested, wrote a letter to the

---

**3.** I also take issue with the dissent authored by Justice Neely. It certainly should be recognized as the ultimate treatise on how to deprive citizens of their constitutional rights.

Attorney General requesting an opinion as to when the Commission could meet. Legislators contacted the proposed chairman of the Commission prior to the Governor's appointment about his feelings on a legislative pay raise, including the amount, and got an agreement as to how certain travel expenses would be handled in the future.

So, it was no surprise at all that a typed compensation and expense resolution, with fill-in blanks as to amount, was sent to the Commission members, including the new ones, as the agenda for the only Commission meeting held prior to submission of the resolution on March 3, 1994. The resolution included intricate details about payment of compensation for extra duties performed by legislators and even delegated to certain legislative leaders the Commission's power to set extra compensation for some members. The record of the meeting·is devoid of any discussion by the Commission about these matters. Nor was there any discussion about any of the matters contained in the typed resolution, by the Chairman concerning his private conversations with legislators or by any member of the Legislature appearing before the Commission, to explain the need for the proposed items in the resolution. Nor did the Commission attempt to call any legislator or legislative staff to explore the need for a pay raise, as you would think a duly independent Citizens Commission would do, before recommending an increase in compensation from $6,500.00 to $20,000.00.

Can anyone believe that this was not a legislative preemption of the authority of the Citizens Legislative Compensation Commission to achieve their own desires? The Citizens Commission was transformed into an arm of the Legislature and turned its back on the citizens they were appointed to represent. The blame lies not so much with the Commission as it does with those legislators who participated in the takeover of the Citizens Commission.

The last issue which the majority touches on, but quickly forgets, is the question of due process. "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." W.Va. Const. Art. III, § 10. The intervenors argue that due process was a sham.

What exactly is required by due process generally depends upon the facts of each case. More than anything else, however, due process means "fundamental fairness." *Pinkerton v. Farr,* 159 W.Va. 223, 220 S.E.2d 682 (1975). Inherent in our form of government is the concept that due process insures that the citizens of this State receive the benefit of all legislative enactments. *Hodge v. Ginsberg,* 172 W.Va. 17, 303 S.E.2d 245 (1983). *See also Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781 (1981).

The record in this case reveals a process that is fundamentally unfair to the people of West Virginia. By refusing to take issue with the Legislature's actions, the majority condones undisclosed *ex parte* communications and knuckles under to legislative pressure.[4] The citizens of West Virginia are entitled to an unbiased Commission and a fair recommendation before being deprived of their tax dollars.

The only way that government officials can re-establish the trust of the citizens they are elected or appointed to represent is to be completely open with the people of West Virginia. Circumvention of the Constitution or the statutes, even to achieve an important goal, serves only to weaken our government. Government officials must go beyond the procedure that is required to instill confidence in the citizens.

The only people who got any due process in this instance were the legislators. Are we

---

4. Like the E.P.A. regulation in *Sierra Club v. Costle,* 657 F.2d 298, 401 (D.C.Cir.1981), discussed in the majority opinion, nothing in Article VI, § 33 forbids *ex parte* communication with the Commission. Likewise, I do not believe such communication should be forbidden, absent a constitutional provision to the contrary. What should be required, however, is that any *ex parte* communication between the Commission and legislators be reported at the public meeting. The balance between individual communication and public reporting of the contact can only be maintained if the Commission members are truly independent and not members appointed at the legislature's request.

not entitled to more from our elected officials? Apparently not.